Dr. Eugene T. REED, Sr., Dr. Harold Kop-
chynski, Dr. Warren St. James, Isabell
Kennedy, Reginald Harewood, Robert
Bean, Lillian Scott, Bernice G. Burnett,
Gwendolyn Brown, on behalf of them-
selves and all others similarly situated,
Plaintiffs,

v.

TOWN OF BABYLON, Richard H. Schaf-
fer Jr., Anthony A. Tafuri, Francine V.
Brown, Patrick Haugen and Robert E.
Kaufold, Defendants.

No. 88–CV–0566(JS).

United States District Court,
E.D. New York.

Jan. 18, 1996.

Margaret Ford, Brooklyn, New York and Edward S. Hom, Rego Park, New York, for Plaintiffs.

Katharine I. Butler, Columbia, South Carolina and Richard C. Mulle, Martin, Fallon & Mulle, Huntington, New York, for Defendants.

## OPINION AND ORDER

SEYBERT, District Judge:

Plaintiffs, African–American citizens of the Town of Babylon in Suffolk County, Long Island, New York, challenge the town's at-large election system for its Town Board, charging that the system violates Section 2 of the Voting Rights Act of 1965, as amended (the "Act"), 42 U.S.C. Section 1973, and the First, Thirteenth, Fourteenth and Fifteenth Amendments of the United States Constitution. Plaintiffs allege that the at-large method of electing the Town Board dilutes the voting power of the Town of Babylon's African–American citizens. Plaintiffs seek to have the present method of election declared invalid and to have it replaced by single-member districts.

Having considered the testimony and exhibits presented during the course of a six- and one-half day non-jury trial, discovery materials and the parties' written submissions following trial, the Court concludes that plaintiffs have failed to demonstrate either a violation of the Act or of their constitutional rights.

## FINDINGS OF FACT[1]

### A. The Parties

#### 1. *Plaintiffs*

■ United States District Judge Korman certified the plaintiff class on April 27, 1989 to represent African–American and Hispanic citizens of the Town of Babylon. At no time during the trial, however, was any evidence offered that plaintiffs, all of whom are African–American, represented the interests of the Town's Hispanic population. Consolidating minority groups is permissible where the statistical evidence is that the minority groups vote cohesively for the same candidates. *See League of United Latin American Citizens v. Clements*, 999 F.2d 831, 863–64 (5th Cir.1993) (*en banc*), *cert. denied*, —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). In the case at bar, plaintiffs did not offer even evidence that Hispanic voting strength was being diluted by the challenged method of election, much less attempt to show cohesive voting across ethnic groups. In fact, in examining the voting preferences of the Town of Babylon's African–American citizens, plaintiffs combined the votes of Hispanic voters with those of other non-African-American citizens. Plaintiffs' counsel, Margaret Ford, essentially conceded that the lawsuit no longer sought to protect the voting rights of the Town's Hispanic community, noting beginning of the trial that "we have not talked about the rights of Latinos in this particular lawsuit ..." (Tr. at 144.)

A district court may decertify a class pursuant to Fed.R.Civ.P. 23(c)(1). This rule provides that "as soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. Any decision under this subdivision may be conditional, and may be altered or amended before the decision on the merits." Fed.R.Civ.P. 23(c)(1); *see In re Prudential Securities Inc. Limited Partnerships Litigation*, 158 F.R.D. 301, 304 (S.D.N.Y.1994); *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir.) ("The

---

1. To the extent that a finding of fact constitutes a conclusion of law, it is adopted as such, and to the extent that a conclusion of law constitutes a finding of fact, it is likewise adopted as such.

district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *In re Harcourt Brace Jovanovich, Inc. Securities Litigation,* 838 F.Supp. 109, 115 (S.D.N.Y.1993) ("The court may modify the class, establish subclasses, or decertify as appropriate in response to factual development." (citations omitted)).

■ The issue of whether a class should be decertified may be raised by the Court acting *sua sponte. In re Prudential Securities,* 158 F.R.D. at 304; *Gerstle v. Continental Airlines, Inc.,* 466 F.2d 1374, 1377 (10th Cir.1972). Given the complete lack of evidence of Hispanic vote dilution, the Court on its own motion decertifies the class in so far as it purports to be made up of Hispanic citizens. Plaintiffs' claims with respect to Hispanic citizens are dismissed in their entirety. The class certification remains effective for African–American citizens of the Town of Babylon.

### 2. Defendants

Defendants are the Town of Babylon and the current members of the Town Board, sued in their official capacities as Board members.

### B. The Current Method of Election

The Babylon Town Board consists of four board members and the Town Supervisor, who is a full voting member of the Town Board. N.Y. Town Law § 60 (McKinney 1987). The four board members are elected at large to four-year, staggered terms (two in each election cycle). N.Y. Town Law § 24 (McKinney 1987 and Supp.1995). The Supervisor is elected at large to a two-year term. N.Y. Town Law § 24 (McKinney 1987 and Supp.1995). In addition to being a vot-

ing member of the Council, the Supervisor is also a full-time employee of the Town and its chief executive and administrative officer. N.Y. Town Law §§ 52, 60 (McKinney 1987). Under New York law, neither the number of Board seats nor the method of election may be changed without submitting the issue to the voters in a referendum. N.Y.Town Law § 81 (McKinney 1987). Moreover, New York law specifically provides only for the number of board seats to be changed from four to either to six or two. N.Y. Town Law § 81 (McKinney 1987).

■ Town Board elections are partisan. A candidate may appear on the ballot under more than one party label. For example, the Republican nominee is often also the nominee of the Right to Life Party. There is no majority vote requirement. The top two finishers among the Town Board candidates are elected. Single shot, or bullet, voting, referring to a voting practice in which a voter is allowed to cast fewer than all of his or her votes, thus enhancing the significance of each vote she or he casts, is permitted.[2]

As of the date of trial, three members of the Town Board, including the Supervisor, were Democrats and two were Republicans. None is African–American. In the past twenty years, only one African–American, Myrna Taylor in 1993, has run for the Board. In November 1995, both the Democratic Supervisor, Richard Schaffer, and the two Democratic members of the Town Board were reelected.

### C. Population and Geographical Information

The 1990 U.S. Census of Population reports the following population information for the Town of Babylon:

---

**2.** "For instance, in an at-large election for five [seats], a voter may have five votes. If the voter casts only one of those votes—that is, votes for only one person, and does not use her other votes—then she has engaged in single-shot (or "bullet") voting. An anti-single-shot provision prohibits this practice. In effect, such a provi- sion forces minority voters to cast votes for white candidates whom the minority voters may not favor, thereby increasing the vote totals of those white candidates." *Westwego Citizens for Better Government v. City of Westwego,* 946 F.2d 1109, 1112 (5th Cir.1991). The votes that the voter does not exercise are often termed "blank votes."

| | Population | Voting Age Population |
|---|---|---|
| Total | 202,889 [3] | 154,988 [4] |
| White [5] | 172,605 (85.07%) | 134,306 (86.66%) |
| African–American | 30,284 (14.93%) | 20,681 (13.34%) [6] |

The 1990 U.S. Census of Population reports a small percentage of Hispanics for Babylon and even smaller percentages of other groups.

The Town of Babylon is contained within Suffolk County. Within the Town of Babylon itself are incorporated and unincorporated villages and hamlets, including, based on a 1987 map of the Town that defendants admitted into evidence and plaintiffs did not contest,[7] Wyandanch, Amityville, North Amityville, Deer Park, Lindenhurst, North Lindenhurst, East Farmingdale, Wheatley Heights, Babylon, North Babylon and Copiague. These villages and hamlets appear to command allegiance from their residents, who tend to identify their homes as being in one of the villages, for instance, Wyandanch, rather than in the Town of Babylon.

■ The Town of Babylon contains three areas of compact African–American population. The largest concentration is in the Wyandanch and Wheatley Heights area and is composed of Voter Tabulation Districts [8] 115, 135, 145, 74, 14, 141, 56, 147 and 124. This concentration is on the northern border of the town, roughly in the center. Its population includes 11,864 African–Americans, using 1990 Census figures. The second concentration is in the area of North Amityville, which is on the western border of the Town, slightly north of the center point of the border. This concentration is composed of Voter Tabulation Districts 129, 72, 42, 65 and 140. Its population includes 9,215 African–Americans, using 1990 Census figures. The third concentration is on the eastern border in the hamlet of Deer Park. This concentration is identified as Voter Tabulation District (also election district) 60. Approximately

3. Plaintiffs claimed that the total population figure for the Town was 202,846, 43 people short of the figure reported in the 1990 Census. Plaintiffs eventually explained that the 43 missing people lived in a census bloc which, for some reason, was missing from plaintiffs' database. Defendants were able to identify the location of the missing census bloc and indicated that it contained approximately 36 to 37 people of voting age.

4. Inexplicably, plaintiffs offered statistics throughout the trial based on a voting population of 154,282, 700 people less than the 1990 Census figure. Towards the end of the trial, plaintiffs revealed that they had inadvertently excluded one election district in their calculation of the voting age population. Plaintiffs never specified whether this election district included the missing census bloc, *see, supra,* note 3, or whether the missing census block also accounts in small part for the discrepancy in data. As a result of these omissions, plaintiffs figures for the white and African–American voting age populations, 134,667 and 19,615, respectively, were lower than those presented by defendants. As plaintiffs acknowledge that their figures are erroneous, the Court will utilize defendants' voting age population data which are, in any event, based on the 1990 Census. *See Campos v. City of Houston,* 894 F.Supp. 1062, 1064 (S.D.Tex.1995) (noting that census data are presumed correct unless evidence to the contrary is presented to show the data to be inappropriate).

5. Since plaintiffs have amalgamated all non-African–American minority groups into the category

of "white," the Court will, for ease of reference, adopt the same convention. Accordingly, all non-African–American citizens of Babylon will be referred to as "white."

6. Luther Blake, Ph.D., president of Blake Associates, a research consulting firm specializing in political analysis and educational research, testified that the larger proportion of white voting age population is directly related to the younger age of the African–American population. The Court qualified Blake as an expert on voting rights.

7. This map was the most comprehensive geographical depiction of the Town offered into evidence.

8. Voter Tabulation Districts, or VTD's, are geographic units that the U.S. Census Bureau has established to report population information. The Census Bureau attempted to have VTDs correspond to New York's election districts in place in 1990, presumably to allow redistricting to take place with minimal disruption of existing election districts. After the 1990 Census, the Town of Babylon altered its election districts but the corresponding VTDs were never redrawn. Thus, there is no longer a clear confluence between VTDs and election districts in the Town of Babylon. According to the parties, the Town has 124 VTDs and 149 election districts. Obviously, some VTDs include two or more of the election districts drawn as of 1990. Of the 149 election districts, 124 are predominantly white and 24 are predominantly or significantly African–American.

1,809 African–Americans live in this third concentration, again using 1990 Census figures. The total African–American population in these three concentrations is 22,888. Each of these population groupings is separated from the others by significant white populations. Moreover, these concentrations are geographically divided. Between Wyandanch and North Amityville are an industrial park, the area of East Farmingdale, Republic Airport and numerous large cemeteries. Between Wyandanch and Voter Tabulation District 60 is the remainder of the hamlet of Deer Park which is predominantly white and residential. Voter participation in the predominantly white region of Deer Park is high.

**D. Use of Statistical Methods to Estimate Voter Behavior**

As an understanding of the voting behavior of the African–American and white populations within the Town of Babylon is critical to determining whether the African–American vote in the Town is being diluted in an at-large election system, both plaintiffs and defendants presented expert testimony at trial regarding voting patterns, dating back to 1983. Lay testimony from both sides on election returns and party affiliation supplemented this expert testimony.

Defendants' expert on voting behavior was Dr. Harold Stanley, Associate Professor in Political Science at the University of Rochester, New York.[9] Plaintiffs' key expert in this area was Franklin Lewis, an independent consultant in political redistricting, economic modeling and statistical analysis.[10] Both experts relied on the statistical methodologies of ecological regression analysis and

extreme case analysis, approved and utilized in the landmark vote dilution case of *Thornburg v. Gingles*, 478 U.S. 30, 61, 106 S.Ct. 2752, 2771–72, 92 L.Ed.2d 25 (1986), to estimate voter behavior in the Town of Babylon. Using these methodologies, Lewis estimated how the Town's African–American and white voters voted in the 1988 Democratic presidential primary, the 1989, 1990, 1991 District Court elections, the 1989 Supreme Court election[11] and the 1993 Town Board election.[12] Stanley applied these methods of analysis to all Town Board and Town Supervisor elections in the period from 1983 to 1993. Moreover, Stanley took the additional step of using these methodologies to estimate more broadly the number of African–American and white registered voters in the Town of Babylon and the political parties to which each group belonged.

**1. Ecological Regression Analysis**

■ Ecological regression analysis is the standard technique used to infer voting behavior among distinct population groups. *Gingles*, 478 U.S. at 52–53 and n. 20, 106 S.Ct. at 2767–68 and n. 20. It would be extremely difficult to interview every voter, classify each by race or ethnicity and determine how each voted and the party to which they belong. Regression analysis allows the parties to surmount this proof-gathering burden by making reasonably accurate estimates of majority and minority voting behavior from demographic data and, depending on whether voting in a specific election or party affiliation is being estimated, election returns and party registration data, respectively. Both plaintiffs' and defendants' experts employed the double-equation ecological regres-

9. Stanley's educational background includes a M.Phil. in politics from Oxford University and a Ph.D. in political science from Yale University. As of mid-1994, Stanley had been retained as a consultant or expert witness in 28 voting rights cases. He is the author of numerous books, journal articles and book chapters on partisanship and voting in the United States.

10. Lewis's educational background consists of a B.A. in Mathematics, Statistics and Operations Research from Yale University and completion of the course curriculum required for a Masters in Management Science from M.I.T. Sloan School of Management. His prior work experience includes serving as a legislative districting consul-

tant for the Nassau County Commission on Government Revision, the New York State Supreme Court and the New York City Districting Commission. Lewis has also served as a staff member responsible for political districting analysis for the New York State Senate and Assembly.

11. These elections, which are for offices not at issue in this litigation, will be termed "exogenous elections."

12. Lewis also stated that he used these methodologies to study the 1994 State Comptroller's race. As he did not supply the Court or defendants with any documentation of his results, the Court declines to credit his conclusions on this race.

sion method which generates an estimate of the voting behavior of the electorate by race as well as an estimate of voter turnout by race. *See* Bernard Grofman *et al., Minority Representation and the Quest for Voting Equality* 86 (Cambridge Univ.Press 1992) (Pl.Exh. 9) [hereinafter *"Grofman "*].

In utilizing double-equation ecological regression analysis to determine the political party affiliation of minority and majority groups, the dependent variable, plotted on the vertical axis, would be the percentage of African–American or white registered voters in a given election district who are Democrats/Republicans. If voting patterns in particular elections were being studied, the dependent variable would be the percentage of African–Americans or white registered voters who voted for a specific candidate. The percentage of the election district's voting age population that is African–American or white would be the independent variable plotted on the horizontal axis. Two regressions would be performed for each candidate running for election or for each political party, depending on whether voting or party affiliation was being studied. One regression would compare the African–American voting age population in each election district with the support that a candidate or particular political party received in that district. The second regression would compare the white voting age population in each election district with the support that a candidate or particular political party received in that district. These data are then used as coordinates to plot points on a graph. A line is drawn which best fits the points on the graph. The place at which the line crosses the left vertical axis of the graph may be interpreted as representing the voting pattern or political affiliation, as the case may be, in an average election district with no African–Americans while the point at which the line crosses the right vertical axis may be interpreted as representing the voting pattern or political affiliation, as the case may be, in an all-African-American election district. The regression line will have a slope which mea-

sures the degree of change in the dependent variable produced by one unit change in the independent variable.

### 2. Extreme Case Analysis

■ Extreme case or homogeneous precinct analysis involves examining election results and party affiliation in election districts [13] where the voting age population is primarily either African–American or white. This analytical method has the advantage of simplicity and directness over ecological regression analysis in that it assumes that the voting patterns or party affiliations of a particular racially homogeneous election district are likely to be a fair indicator of the ethnic group's voting pattern or party affiliation more generally. For instance, if white candidates get most or all, and African–American candidates get few or no votes in homogeneous white election districts, that is evidence that whites may be voting along racial lines. One of the obvious problems with homogeneous analysis is that the voting patterns of voters in a racially homogeneous area may not, for a variety of economic, social or political reasons, be typical of voters of the same racial group located in a racially-mixed district. *See id.* at 85. It is therefore recommended that results be compared to those from ecological regression analysis. *Id.*

Only election districts where the race or ethnicity of the voting age population is at least 90% homogenous should typically be subjected to extreme case analysis. In the case at bar, however, plaintiff's expert, Lewis, indicated that only one election district was at least 90% African–American in voting age population. He therefore expanded his analysis to include five additional election districts whose voting age population was at least 85% African–American. Stanley, on the other hand, found at least eight election districts in the period prior to 1987 to be 90% or greater in African–American population [14] and four Voter Tabulation Districts

---

**13.** The election district in which a voter lives determines where that voter will be assigned to vote.

**14.** Stanley testified that prior to 1990, the U.S. Census Bureau did not publish data for voting

age populations in small municipalities such as Babylon. Therefore, Stanley used 1990 Census

from 1987 onward that were at least 90% African–American in voting age population. Lewis attempted to account for this discrepancy by claiming that Stanley may have counted as African–American the portion of the Hispanic community reported by the U.S. Census Bureau as black Hispanic. The inconsistency in the number of districts having a population at least 90% African–American may also be attributable, in the case of pre–1987 elections, to Stanley's use of total population figures from the 1980 Census of Population rather than 1990 Census voting age data, to Lewis's erroneous voting age population figures or to simple error by one of the parties. The discrepancies were never adequately explained to the Court. Both experts did concur that, assuming close to 100% of the African–American community's support, a candidate would need the votes of at least 43% to 45% of the white voting age population to be elected.[15]

### 3. *Other Methods for Evaluating Voting Behavior*

John Flateau, Executive Director of the DuBois Bunche Center for Public Policy at Medgar Evers College, City University of New York, also testified on plaintiffs' behalf as a political expert. Flateau examined the election results in predominantly African–American and white election districts when an African–American candidate was seeking office. Flateau did not use the statistical techniques of ecological regression analysis and extreme case analysis. He simply visually studied election results and concluded that the minority candidate usually won in election districts that were predominantly Af-

rican–American but lost in election districts that were predominantly white.

Simply because the minority candidate usually won in predominantly African–American election districts and lost in white districts does not, *a fortiori*, mean that he or she had weak or insufficient support from the white community. In fact, Flateau's very definition of a predominantly African–American election district, an election district having an African–American population greater than 50%, makes it difficult to estimate even whether the minority candidate received his or her support from the minority or majority community. A number of the election districts in which the minority candidate succeeded had in fact a significant white constituency from which the candidate could have received votes. The Court, accordingly, finds that Flateau's conclusions are too attenuated to be given weight of any significance. Even plaintiffs' other expert, Lewis, stated that a mere visual examination of election data would not allow for accurate interpretation.

### E. Registration and General Election Data

New York maintains registration data by party, but provides no racial breakdown. Stanley testified without contradiction that as of October 1993, African–Americans comprised approximately 12.8% of all registered voters in the Town of Babylon, a percentage slightly less than their percentage of the voting age population. Stanley also provided registration by race and party as of October 1993:

| Party | Total population registered as: | African–American registered voters registered as: | White registered voters registered as: |
|---|---|---|---|
| Republicans | 40,892 (41.0%) | 5.0% | 46.3% |
| Democrats | 31,955 (32.1%) | 83.3% | 24.5% |
| Others | 26,817 (26.9%) | 11.7% | 29.2% |

voting age population data for elections in or after 1987 and 1980 Census general population data for elections prior to 1987. Lewis, on the other hand, utilized the voting age population data specified in footnote 4, *supra*, in his analyses.

15. Lewis testified that the threshold would be 43% while Stanley indicated that it would be 45%.

Stanley arrived at these estimates of white and African–American registration by political party by performing ecological regression and extreme case analysis using New York State registration data from October 1993 and 1990 Census data. Plaintiffs' expert Blake testified to slightly different figures regarding party affiliation in the Town of Babylon but did not disclose the source of his data. According to Blake, 42.3% of registered voters were Republican, 31.4% were Democrats and 26.3% were independent.

Analysis of election returns and testimony from two lay witnesses with long involvement in local politics, Richard Schaffer, the Town Supervisor since 1992 and a member of the Democratic Party, and Sondra Bachety, currently co-chairperson of the Babylon Democratic Party,[16] indicate that a majority of voters who register as independents or as members of parties other than the Democratic or Republican parties tend to vote Republican in local elections. Bachety testified that voters classifying themselves as independents or members of minor parties generally split their votes on a 60%–40% basis between Republican and Democratic candidates, respectively.

Despite their minority status among registered voters, Democrats have controlled the Town Board since 1987. Two Democrats were elected to Board seats in 1987 and reelected in 1991. Democrats also captured the Supervisor's seat in 1987 and have held it since that time. Historically, however, Republicans have dominated Town Board elections. Democrats have won only 7 of the 22 council seats elected since 1975. For all but three years from 1967 to 1987, Republicans held the Supervisor's seat. Republican domination of local politics extends to the Suffolk County legislature which is selected on the basis of single-member districts. Elections involving judicial officers are quasi-partisan under state law and have been Republican-dominated.

## F. Voter Turnout

The Court's own analysis of the parties' data and Stanley's expert testimony reveal that African–American voter turnout is lower than their rate of voter registration and their proportion of voting age population. The 1993 Town Board election represented the highwater mark in African–American voter turnout: African–Americans constituted 10.7% of voters at the polls.

The Court's calculations show the following turnouts for other elections:

| Election | African–American Voters as % of Voters at Polls |
|---|---|
| 1987 Town Board Contest | 7.9% [17] |
| 1989 Town Board Contest | 8.36% |
| 1991 Town Board Contest | 7.21% |
| 1989 District Court Contest | 7.14% [18] |
| 1989 Supreme Court Contest | 6.6% [19] |
| 1991 District Court Contest | 8.7% |

Voter turnout among all races and ethnic groups as compared to total voting age population (154,988, using 1990 Census figures) was generally low in the contests specified

16. Schaffer also served in the Suffolk County Legislature from 1987 to 1992 and was extensively involved in local community politics and Democratic party campaigns prior to that time. Bachety served on the Town Board from 1967 to 1979 and then in the Suffolk County Legislature from 1983 to 1993.

17. The Court was unable to calculate the turnout for Town Board elections prior to 1987 because defendants failed to specify the 1980 Census total population data for the Town of Babylon.

18. The Court used the actual votes received by candidates in this calculation, as determined by the Suffolk County Board of Elections, rather than the votes that Lewis estimated from regression analysis. Since this election involved two seats, all votes, including blank votes, needed to be totaled and divided by two in order to determine voter turnout in this election. Total voter turnout is one of the variables necessary in calculating African–American voter turnout. Since Lewis failed to calculate an estimate for blank votes, total voter turnout could not be calculated.

19. The same problem described in note 18, *supra*, applies to this election which involved three seats on the New York State Supreme Court.

above, being consistently at about 30%. In the 1993 Town Board election, this percentage was as low as 26.7%.

## G. Individual Election Contests

### 1. *The 1988 Democratic Presidential Primary*

The earliest election that Lewis analyzed was the 1988 Democratic presidential primary in which the Reverend Jesse Jackson was a candidate. Lewis concluded that a majority of African–American voters supported Jackson and that a majority of white voters supported the several white candidates seeking the nomination. Lewis's ecological regression estimates of the percentage of the white vote that the candidates other than Jackson received, however, differed markedly, by as much as 19.8%, from the total actual votes these candidates received.

### 2. *Judicial Contests*

All except one of the local contests that Lewis examined were judicial elections. Judicial elections tend to be low-profile contests in which voters are likely to vote along party lines. Town Board elections are somewhat similar in that, according to Bachety, unless a candidate is a well-known person or has a "very high profile campaign" (Tr. at 657), which she defined as a "well-financed, well-run campaign" (Tr. at 669), the candidate would have a difficult time attracting the attention of voters to the same extent as candidates for the Town Supervisor's or Suffolk County Executive's race. In Bachety's view, if voters in the Town were unfamiliar with the candidates, they would be more likely to vote along party lines.

Judicial elections do differ from Town Board contests, however, in that judicial candidates are more limited in their ability to campaign.[20] Candidates, therefore, do not have the same opportunity to make themselves stand out above the others. There was also uncontroverted testimony regarding the critical importance of cross-endorsements in judicial elections, a factor absent in Town Board races.

Lewis's review of judicial contests had other problems. His regression analysis revealed that in the 1990 District Court election, African–American support for Francel Maria Trotter–Bellinger, the African–American candidate, was zero, a figure obviously in error since Lewis's extreme case analysis for the same election indicated that 90% of the voters in predominantly African–American election districts supported Trotter–Bellinger. Moreover, as in the case of the 1988 Democratic primary, Lewis's regression analysis of this election, the 1989 and 1991 District Court contests and the 1989 Supreme Court race produced estimates of African–American and white support for the various candidates that did not closely correlate with the actual votes received by these candidates. Following are charts reflecting these discrepancies:

| Candidate (Party–Race) | Lewis Estimate | Actual Votes Received |
|---|---|---|
| 1989 District Court Contest (Top four candidates) | | |
| Trotter–Bellinger D–B | 16,503 | 15,694 (off by 809) (5.1%) |
| Klein R–W | 23,701 | 20,703 (off by 2,998) (14.5%) |
| Barton R–W | 25,317 | 23,285 (off by 2,032) (8.7%) |
| Braslow D–W | 16,482 | 15,653 (off by 829) (5.3%) |

**20.** For instance, N.Y. Judiciary Law, Code of Judicial Conduct, Canon 7 (McKinney 1992 (Appendix)) strictly limits the political involvement of a judge or judicial candidate by prohibiting him or her from (1) holding political office or acting as a political leader, (2) making political speeches for a party or candidate, (3) endorsing candidates, (4) soliciting funds for political organizations, (5) contributing funds to political organizations or attending or speaking at political gatherings, except, assuming adherence to other conduct, during the judge's or judicial candidate's own campaign, (6) directly soliciting campaign funds or publicly stated support, (7) acting in an undignified manner, (8) making pledges or promises of conduct if elected to office or (9) announcing his or her views during a campaign on disputed legal or political issues.

| | | 1990 District Court Contest | |
|---|---|---|---|
| Trotter–Bellinger D–B | 13,601 [21] | 15,751 (2,150) (13.6%) | |
| Loughlin R–W | 23,701 | 22,069 (1,632) (7.4%) | |
| | 1991 District Court Contest | | |
| Trotter–Bellinger D–B | 20,467 | 19,296 (off by 1,171) (6.1%) | |
| Costello R–W | 24,375 | 22,571 (off by 1,804) (8%) | |
| | 1989 Supreme Court Contest (Top six candidates) | | |
| Floyd R–B | 26,013 | 24,216 (off by 1,797) (7.4%) | |
| Freidenberg D–W | 15,113 | 14,506 (off by 607) (4.2%) | |
| O'Brien R–W | 24,240 | 22,531 (off by 1,709) (7.6%) | |
| Segal R–W | 22,220 | 20,743 (off by 1,477) (7.1%) | |
| Seidell D–W | 17,984 | 17,005 (off by 979) (5.8%) | |
| Winick D–W | 14,650 | 13,902 (off by 748) (5.4%) | |

Lewis and Stanley disagreed as to the degree of discrepancy between estimated and actual election results that would render an expert's ecological regression analysis unreliable. Stanley testified that the percentage difference between estimated votes calculated through regression analysis and actual election results should be less than ¾%, as a greater discrepancy would denote a mistake in data transposition or in presentation of the expert's results. Lewis indicated that a discrepancy of less than 10% was not problematic, citing as authority *Grofman, supra,* at 92 ("if at the jurisdictionwide level, estimates of known values show a discrepancy of more than, say, 10 percent, there is reason to scrutinize the results with special care"). Only Lewis's regression analyses of the 1988 Democratic primary and the 1989 and 1990 District Court campaigns yielded possible error in excess of 10%. Although not as severe, the mismatch between actual election data and Lewis's estimates in the remaining judicial contests were all in excess of 4%. Lewis made little effort to justify the discrepancies. He stated only that, "[t]he differences—I am not sure exactly what the causes of the differences are between my estimated vote totals and the actual total votes. For just about every case, they are within the accepted ten percent range." (Tr. at 1046.) This response is troubling, as even the source that Lewis cites does not state that discrepancies under 10% are acceptable but rather that those over 10% should be viewed with "special care." That does not mean that possible error under 10% requires no explanation. *See Cousin v. McWherter,* 904 F.Supp. 686, 693 (E.D.Tenn.1995) (where expert noted that accuracy of regression analysis evidenced where data are within a "few percentage points or two" of actual votes that candidates received).

In light of Lewis's inability to explain the discrepancies in his results and Stanley's testimony that regression estimates should closely correlate with known data, the Court has difficulty relying on Lewis's regression estimates. Nevertheless, the Court will proceed in examining Lewis's estimates for the 1989 and 1991 District Court elections and the 1989 Supreme Court election. The Court declines to consider more closely the returns from the 1990 election since, given Lewis' clearly erroneous attribution of zero African–American votes to Trotter–Bellinger, it is impossible to assess whether the votes that she did receive came from white or African–American voters.

In the 1991 District Court contest which involved only a single judicial seat, Lewis's regression analysis reveals that 40.5% of white voters supported the African–American Democrat, Trotter–Bellinger, and 59.5% of white voters supported the white Republican candidate, Ralph Costello. 100% of African–Americans voting were estimated to have supported Trotter–Bellinger. Lewis's extreme case analysis shows that 59% of voters in predominantly white districts supported Costello and 94% of voters in predominantly African–American districts supported Trotter–Bellinger. Lewis did not produce an extreme case analysis of white support for the African–American candidate and African–American support for the white Republican

**21.** Since Lewis's regression analysis erroneously attributed zero votes from the African–American population to Trotter–Bellinger, all votes in this category are estimated to have come from white voters.

candidate. If one assumes that votes not cast for the candidate reported were cast for other candidate, then predominantly white districts provided 41% support to Trotter–Bellinger and predominantly African–American districts provided 6% support to Costello.

The remaining judicial election contests that Lewis considered were ones in which more than one seat was up for election. In the 1989 Supreme Court judicial election, which involved three seats, Lewis's regression analysis indicates that Judge Floyd's share of the white vote was virtually indistinguishable from that of the two white Republicans, Edward O'Brien and Marvin Segal, who were running in the same contest. Lewis estimated that each Republican received approximately 20% of the white votes cast for a candidate.[22] Judge Floyd was elected along with O'Brien and Segal. Lewis's regression analysis estimated that Judge Floyd was in third place among African–Americans. Judge Floyd received an estimated 400 votes less than two of the three white Democrats but about 350 votes more than the third Democrat. Lewis's extreme case analysis were generally consistent with these findings, although that analysis ranked Judge Floyd as the first choice among African–American voters.

In the remaining multi-seat judicial election that Lewis studied, the 1989 District Court contest involving two seats, Lewis estimated, using extreme case analysis, that African–American election districts gave their greatest support to the African–American candidate Trotter–Bellinger (50.96% of votes cast for a candidate),[23] substantial, but significantly less, support to the white Democrat, Steven Braslow (38.28% of votes cast for a candidate), and very little support to the Republicans and other party candidates. White election districts gave their greatest support to the two white Republican candidates, Patrick Barton and Joseph Klein, Jr., (31.99% and 29.91% of votes cast for a candidate, respectively), and lesser, but roughly equal, support to Trotter–Bellinger and Braslow (16.77% and 18.00% of votes cast for a candidate, respectively).

Regression analysis of the 1989 District Court election attributed 58.3% of the African–American vote to Trotter–Bellinger, with the remaining 41.66% of the African–American vote going to Braslow. Lewis's regression analysis of white voting patterns in this election more closely corresponded with his extreme case analysis data. Lewis again found that white voters split their vote, with the Republican candidates receiving between 30.3% and 32.4% of white votes and Trotter–Bellinger and Braslow, the two Democrats, receiving 16.2% and 17.6%, respectively, of white votes.[24] The Republicans, Barton and Klein, were the victors in this race.

### 3. *1993 Town Board Election*

Both Lewis and Stanley analyzed the 1993 Town Board election, the first such election in which an African–American was on the ballot. As evidenced by the chart below, the same discrepancies between the estimated and actual votes received by a candidate that existed in Lewis's regression analysis of judicial elections are present in Lewis's analyses of this election.

| Candidate (Party–Race) | Lewis Estimate | Actual Votes Received |
|---|---|---|
| Taylor D–B | 18,865 | 17,615 (off by 1,250) (7.1%) |
| Horsley D–W | 19,382 | 18,038 (off by 1,344) (7.4%) |
| Brown R–W | 22,355 | 20,786 (off by 1,569) (7.5%) |
| Tafuri R–W | 20,469 | 19,041 (off by 1,428) (7.5%) |

Again, the Court will proceed, despite this problem, to consider both experts' conclusions. The Court has the additional comfort in this case that Stanley's and Lewis's estimates were comparable.

22. Lewis failed to estimate the number of votes cast for no candidate, also known as blank votes. It was therefore impossible to calculate an estimate of a candidate's share of all votes cast. Only comparisons of the votes cast among candidates could be made.

23. *See, supra,* note 22.

24. The Court made these calculations using the information in Plaintiffs' Exhibit 14. They differ from the figures on page 19 of Plaintiffs' Exhibit 4 because the exhibit erroneously listed the white vote for Republican candidate Klein as the African–American vote for this candidate. Correction of this error required recalculating the percentages for each candidate.

Stanley's ecological regression and extreme case analyses found that 97% and 81.8%, respectively, of African–American voters at the polls supported the election of Myrna Taylor, the African–American candidate. Lewis's regression and extreme case analyses attributed 57% of African–American votes cast for a candidate to Taylor and 49.4% of such votes to her white Democratic running mate, Wayne Horsley, respectively.[25]

Taylor testified during trial that she had not performed as well as Horsley in Babylon's white communities. This claim is not borne out by either expert's findings. According to Stanley, Taylor and Horsley garnered the support of an estimated 36% and 40% of white voters, respectively. Lewis estimated that Taylor and Horsley commanded 20% and 22% of white votes cast for a candidate, respectively. Thus, both experts' analysis showed that white voters favored Taylor at nearly the same rate as Horsley.

The Republican candidates in the 1993 Town Board contest fared considerably better in the white regions of the Town than the Democrats. Stanley estimated that Anthony Tafuri and Francine Brown garnered support from 52% and 56.5% of white voters, respectively. Lewis found Tafuri and Brown to have received between 28% and 31% of white votes cast for a candidate, respectively. This white support led Tafuri and Brown to victory.

### 4. *Town Board and Town Supervisor Elections: 1983–1993*

During the period from 1983 through 1993, there were twelve Democratic candidacies for Town Board seats. Republicans won eight out of the twelve seats. Taylor received more support on the Democratic line from white voters than six of the eleven white Democratic candidates running in the period from 1983 to 1993.

In 1987, Democrats gained a majority of the Town Board for the first time since at least 1967. Schaffer and Bachety testified to the causes leading to the defeat of the incumbent Republican Town Supervisor and his two incumbent Republican running mates competing for the Town Board seats. A private citizen unhappy with a Board decision affecting his business launched a well-financed campaign to defeat the incumbents. The personal popularity of the Democratic candidate for County Executive, who won a landslide victory in that election, further aided the Democratic Town Board candidates.

In the next election in 1989, the now incumbent Democratic Supervisor, Arthur G. Pitts, was able to gain reelection but his personal popularity was insufficient to carry his running mates for the Board seats, both of whom lost to the Republican incumbents. In the 1991 election where the Supervisor, Pitts, and both Democratic Board members were running as incumbents, the Supervisor was reelected, finishing first among, but without majority support from, white voters. The two incumbent Democratic Board members lost among white voters, but were reelected by virtue of overwhelming support from African–American voters.

In the 1993 election, Schaffer, as the Democratic candidate for Town Supervisor, gained for the first time ever for a Democratic candidate running for Town office, majori-

**25.** The disparity in the experts' results is a function of the different way in which they reported their data rather than an incongruence of significance. Lewis estimated the votes received by each candidate from the African–American community and divided that estimate by the total number of votes cast for all candidates. Since voters were permitted to cast two votes, no one candidate could receive 100% of the votes cast. If every voters cast two ballots, the highest percentage for any one candidate would be 50%. Since voters may elect to cast only one vote, however, a candidates' percentage of total votes cast for a candidate could exceed 50%.

Stanley, on the other hand, calculated the percentage of African–American voters who cast votes for a particular candidate. Although one would presume that by multiplying Lewis's esti-

mates by the number of seats in contention, in this case two, one could arrive at a figure that could be directly compared with Stanley's estimates, this would not be an entirely accurate comparison. The Suffolk County Board of Election election tallies show that blank votes were cast in the 1993 Town Board election. Lewis, however, failed to estimate the number of blank votes. Therefore, doubling Lewis's estimated percentages, which merely reflect a comparison of votes cast per candidate as opposed to a comparison of all votes cast (including blank votes) would overestimate somewhat the percentage of the African–American or white vote that a candidate received. Despite this problem of comparison, both experts agreed that their estimates were roughly comparable.

ty support from the white community, earning between 59.5% and 59.7% of the white vote. Schaffer's popularity, however, was unable to carry the other Democratic candidates for the Town Board to victory.

### 5. African–American Support for Democratic Candidates

In all but one of the elections that Lewis and Stanley examined, the African–American community in Babylon provided majority support to the Democratic candidates, many of whom were white. The one exception to this pattern is that the African–American community supported Judge Floyd's 1989 campaign for New York State Supreme Court over at least one and possibly all (depending on whether Lewis's regression or extreme case analysis is relied on) of his white Democratic opponents. Lay testimony regarding other elections not studied by Lewis and Stanley indicates that this African–American support of an African–American Republican over a Democratic candidate may be atypical. Schaffer and one of the named plaintiffs, Dr. Eugene T. Reed, testified that in a Suffolk County legislative contest, African–American voters, including Reed himself, supported the highly popular white Democrat Maxine Postel over the politically inactive African–American Republican candidate, Ron Travis, who was from North Amityville.

### H. History of African–Americans in the Town of Babylon

No African–American witnesses at trial testified to having experienced difficulty in registering to vote. Nor was any witness aware that his or her parents had experienced difficulty. In fact, in response to interrogatories during the discovery phase of this litigation, plaintiffs stated that no member of their class had ever been prohibited from voting, from running for office, from registering in the political party of their choice, from participating in the internal affairs of the political parties, from attending meetings of political parties or from attending conventions at which candidates for local election were selected. Plaintiffs' interrogatory responses also failed to identify any differences in the Town's registration and voting procedures for African–American and other citizens. Plaintiffs further represented in their interrogatory responses that African–Americans in the Town of Babylon have sought and been elected to offices in both the Democratic and Republican parties.

At trial, Reed reported that in 1979, he assisted in an African–American voting registration drive that added 2,000 new voters to the Suffolk County registration rolls. He testified that Suffolk County police officers subsequently appeared at the homes of the new registrants to verify registration information. Plaintiffs did not provide the names of any registrants who were contacted. Plaintiffs did offer into evidence a letter, dated May 22, 1981, from the United States Attorney's Office in the Eastern District of New York to the Board of Election of Suffolk County which referred to "numerous Civil Rights complaints surrounding the verification procedures utilized by the Suffolk County Police Department." This letter was never authenticated in accordance with Federal Rule of Evidence 901. Given that the authority and signature of the letter's signatory was never verified that the letter is dated May 22, 1981, approximately two years after the incident about which Reed testified, that it is somewhat unclear whether the letter is referring to the same incident and that the letter assumes knowledge of facts not in the Court's possession, the Court is unable to give significant weight to the letter.

Plaintiffs testified to a number of election campaigns that they believed were characterized by racial appeals or resulted in discriminatory conduct. Reed stated that during his 1979 campaign for a Suffolk County legislative seat, fliers with his picture were circulated in the white community. The caption on the fliers read something to the effect of "The truth is out: If he gets elected, he will only care about North Amityville and Wyandanch." Plaintiffs never supplied the Court with a copy of the flier or specified who was responsible for its distribution. After the 1979 campaign, in which Reed was unsuccessful, the legislative districts were redrawn so that North Amityville and Wyandanch were no longer part of the same district.

Taylor, the African–American candidate in the 1993 Town Board race, testified that during her campaign, the Democratic party's general campaign manager, Leonard Friese, instructed her to concentrate her efforts in the African–American community and not to campaign in the white community. Given the seriousness of this allegation, the Court would have expected plaintiffs to have subpoenaed Friese to testify or given some indication as to his unavailability rather than rely on Taylor's hearsay testimony. While the Court does not doubt that Taylor perceived Friese as having discouraged her from campaigning in the white districts, the Court cannot assess, without Friese's own testimony, whether Friese actually intended to discourage Taylor or whether Taylor may have misconstrued his advice. That Taylor could have misconstrued Friese's advice is buttressed by Schaffer's testimony that Taylor was included in invitations to white neighborhood meetings. Moreover, Taylor herself readily conceded that the Democratic party leadership had actively recruited her to run and included her in campaign activities.

Taylor further testified that racial appeals were used in a 1984 School Board contest in which the NAACP sponsored three candidates, two of whom were African–American. Separate polling places were apparently established for this contest so that African–Americans living in northern Amityville voted at a junior high school in North Amityville while whites living in southern Amityville voted at the high school. Taylor claimed that campaign literature was also circulated stating that if an African–American were elected to the School Board, property values in the region would decline. Plaintiffs did not provide the Court with a copy of this campaign literature or identify who was responsible for its dissemination.

Reed described the general climate in the Babylon community as discriminatory. He began by recalling plans in the 1950's to build two same grade schools on opposite ends of the town. In Reed's view, this plan, had it been carried out, would have resulted in *de facto* segregation of the African–American and white school populations. In the end, however, this plan was scrapped. Reed also implied that discrimination against the African–American community was evident in the tracking that occurred in Babylon schools, whereby students, presumably with more advanced skills, are allowed to take classes commensurate with their abilities. Reed, however, never produced more than a few anecdotes of how tracking in Babylon schools has a discriminatory effect.

African–Americans in the community of Babylon had difficulty through the 1960's entering unions, obtaining employment in the private sector and with the Town government and becoming teachers in Suffolk County schools. The extent to which these barriers persisted after the early 1960's was never clearly addressed. Plaintiffs did indicate that African–Americans presently have adequate representation as teachers in the Suffolk County schools. Reed testified, however, that African–American police officers in the Suffolk County Police Department, which is responsible for patrolling the Town of Babylon, have "had very big problems," resulting in an unspecified number of discrimination suits. (Tr. at 55.)

Plaintiff witnesses testified at length as to the location of the Town's undesirable facilities in the African–American residential districts. Among the facilities plaintiffs cited as being located near African–American residences were the Town's landfill, a crematorium, an animal shelter and high voltage electrical wires. The landfill, located in a large industrial zone in the West Babylon/Wyandanch region, was constructed in the 1940's. No residential population lives immediately next to the landfill. The area near the landfill became residentially populated after the landfill was constructed. Moreover, both African–American and white residents appear to be affected by the landfill's plume. With respect to the crematorium, plaintiffs did not specify what it was about this facility that they perceived as undesirable. The crematorium itself appears to be located in the industrial zone and thus away from residential neighborhoods. Neither party indicated clearly on a map where the Town's high voltage electrical wires were located. Schaffer did testify, however, that white neighborhoods, including his own, were in proximity

to high voltage electrical wires. As to the animal shelter, it was unclear from the testimony whether the African–American community had ever voiced concern to the Town Board about its location. Schaffer further noted that an undesirable not mentioned by plaintiffs, the Town's sewer, was located in a white residential neighborhood.

The Town of Babylon is improving services and expand community development in the African–American communities of the Town. In 1994, 74% of federally funded community development dollars were spent on projects in Wyandanch and North Amityville, predominantly African–American regions of the Town. Over the six-year period ending in 1994, the Town spent 43.7% of federally funded community development dollars on such projects in these communities. In the last year, Schaffer also has discussed with a major supermarket chain the possibility of locating a store in Wyandanch.

Plaintiffs claim that the Town has not adequately policed the African–American communities, resulting in growing crime rates. No statistical support, in the form of higher crime rates, delays in answering 911 calls or number of officers staffing these communities, was offered to buttress this assertion. Reed and Burnett seemed to attribute the problem not to the absence of police officers but to the style of policing. Reed testified that while police officers do patrol in the predominantly African–American regions, there are fewer African–American police officers from those communities assigned to work there than in the past, resulting in Reed's view, in higher crime rates.

The Town is making efforts to improve policing in the predominantly African–American regions. The Town is building a new police substation for the communities of North Amityville and Wyandanch. Schaffer also testified to the Town's attempts to get the County to improve policing in the minority areas of Town.

Plaintiffs also sought to prove that the Town's resources are unequally distributed through testimony that the African–American communities were the last to obtain access to the Town's water supply. Schaffer himself, however, indicated that he had just been hooked into the Town's water system. The Town, moreover, is making efforts to hook up the areas currently without public water. None of these areas are at risk of landfill contamination.

African–American citizens of Babylon appear to have ready access to the current Town Supervisor and serve in a variety of policy-making positions in the Town. Reed is the Deputy Town Supervisor, an appointed political patronage position. His office is next to that of the Town Supervisor. Eugene Burnett, a citizen of the Town, is co-chairperson of the Town's Democratic Party and is consulted by the Supervisor on a variety of matters affecting the Babylon community. Moreover, Burnett, who is also chairperson of the African–American Caucus, frequently makes recommendations to the Town Board of African–Americans to fill vacancies in the Town government and on municipal boards and committees. The Town Board has followed many of these recommendations. Until just prior to trial, Burnett held a paid position on the Industrial Development Council. His replacement on the council is also African–American Taylor, the African–American candidate for the Town Board in 1993, is the Town's Commissioner of Human Resources. Named plaintiffs Lillian Scott, Bernice Burnett and Gwendolyn Brown also hold board positions. African–Americans occupy a share of Town administrative positions and board appointments roughly proportional to their population in the Town.

## CONCLUSIONS OF LAW

I. Section 2 Claim

A. *Applicable Standards*

Congress enacted Section 2 of the Act to eliminate discrimination in voting present since the end of the Reconstruction period in the 1870's. The Act was intended to enforce the Fifteenth Amendment's guarantee that no citizen's right to vote would "be denied or abridged ... on account of race, color, or previous condition or servitude." U.S. Const.Amdt. 15; *see Voinovich v. Quilter,*

507 U.S. 146, 152, 113 S.Ct. 1149, 1155, 122 L.Ed.2d 500 (1993).

In 1982, Congress amended the Act to make clear that a finding of a positive intent to discriminate was not required to make out a Section 2 violation. S.Rep. No. 417, 97th Cong., 2d Sess. 2, 27 (1982) [hereinafter "S.Rep." or "Senate Report"], *reprinted in* 1982 U.S.C.C.A.N. 177, 179, 205. These amendments were a repudiation of the Supreme Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which had held that plaintiffs could successfully challenge a voting scheme under the Act only if they could establish discriminatory intent. *Gingles,* 478 U.S. at 34, 106 S.Ct. at 2758. The 1982 amendments firmly applied the "results" test employed previously in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) in place of the *Bolden* standard. *See* S.Rep. at 2, 20–23, 32–33, 1982 U.S.C.C.A.N. 179, 197–201, 209–11. "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard, the 'results test,' applied by this Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314, ... and by other federal courts before *Bolden,* ...." *Gingles,* 478 U.S. at 35, 106 S.Ct. at 2758; *see also id.* at 97, 106 S.Ct. at 2790–91 (O'Connor, J., concurring).

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color ...

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:

*Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis in original). The Supreme Court's first interpretation of Section 2, as amended, came in *Gingles,* 478 U.S. at 34–5, 106 S.Ct. at 2758, a case challenging certain multimember districts, plus one single-member district, in North Carolina's post–1980 legislative apportionment plan. *Gingles* held that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by African–American and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764; *see also Nipper v. Smith,* 39 F.3d 1494, 1511 (11th Cir.1994) (*en banc* ), *cert. denied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). The Court provided three threshold conditions that must be established in order to prove a Section 2 violation:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, ...—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766 (citations omitted); *see also Johnson v. De-Grandy,* —— U.S. ——, —— – ——, 114 S.Ct. 2647, 2657–58, 129 L.Ed.2d 775 (1994) (emphasizing continued appropriateness of *Gingles* preconditions); *Growe v. Emison,* 507 U.S. 25, 39–40, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (stating that three *Gin-*

*gles* preconditions are applicable both to challenges to multimember and single-member districts).

■ Plaintiffs cannot prevail unless they prove each of these preconditions by a preponderance of the evidence. *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. The first two preconditions, requiring geographic compactness/numerosity and minority political cohesion, are necessary "to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe,* 507 U.S. at 40, 113 S.Ct. at 1084. These preconditions essentially ask "whether the court can fashion a remedy for a demonstrated abridgement" of Section 2 of the Act. *Nipper,* 39 F.3d at 1510–11. No remedy would exist under Section 2 for a group that lacks the population or political cohesiveness, or is too geographically dispersed, to benefit from single-member districts. *See McNeil v. Springfield Park Dist.,* 851 F.2d 937, 942 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

The second *Gingles* precondition is also needed, together with the third, to determine whether "the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Growe,* 507 U.S. at 40, 113 S.Ct. at 1084; *see Monroe v. City of Woodville, Mississippi,* 897 F.2d 763, 764 (5th Cir.) (*per curiam* ), *cert. denied,* 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990); *Collins v. City of Norfolk, Virginia,* 883 F.2d 1232, 1237 (4th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). The second and third preconditions thus relate to liability, that is, whether the "electoral scheme is abridging the right of the plaintiff minority group to vote on account of race or color" in violation of Section 2. *Nipper,* 39 F.3d at 1510–11 (internal quotations omitted).

■ Critical terms in determining whether the preconditions have been met are minority voter "political cohesiveness" and majority "bloc voting." These terms refer to the relationship between the race or ethnicity of the voter and the way in which the voter casts his or her ballot. *See Gingles,* 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21. For

instance, "that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769; *see also Monroe,* 897 F.2d at 764. Although lay testimony may evidence political cohesiveness or racial bloc voting, statistical evidence in the form of double-equation ecological regression analysis and extreme case analysis, presented through expert testimony is typically also offered. *Gingles,* 478 U.S. at 53 n. 20, 106 S.Ct. at 2767; *Monroe,* 897 F.2d at 763 ("Statistical proof of political cohesion is likely to be the most persuasive form of evidence, although other evidence may also establish this phenomenon.").

■ The effects of racial bloc voting can be most severe in at-large elections, where the voting strength of even a substantial minority group may be minimized or canceled by the concerted action of the majority group. *See Gingles,* 478 U.S. at 47, 106 S.Ct. at 2764 (quoting *Burns v. Richardson,* 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376 (1966)) and n. 13; *Chapman v. Meier,* 420 U.S. 1, 16, 95 S.Ct. 751, 760–61, 42 L.Ed.2d 766 (1975) (quoting *Whitcomb,* 403 U.S. at 158, 91 S.Ct. at 1877). Nevertheless, an at-large voting system does not constitute a *per se* violation of Section 2 and is still subjected to the three *Gingles* preconditions. *See Gingles,* 478 U.S. at 48–9, 106 S.Ct. at 2765–66.

■ Satisfaction of the *Gingles* preconditions is essential to a Section 2 vote dilution claim, *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2657, but is not conclusive of the existence of dilution, *id.* at ——, 114 S.Ct. at 2657; *see NAACP v. Niagara Falls,* 65 F.3d 1002, 1019 (2d Cir.1995); *Clements,* 999 F.2d at 849; *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 359 (7th Cir.1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993).

But if *Gingles* so clearly identified the three as generally necessary to prove a § 2 claim, it just as clearly declined to hold them sufficient in combination, either in the sense that a court's examination of relevant circumstances was complete once

the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution.... [T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts. Lack of electoral success is evidence of vote dilution, but courts must also examine other evidence in the totality of circumstances, including the extent of the opportunities minority voters enjoy to participate in the political process.

*DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2657. *DeGrandy* thus affirmed the Supreme Court's indication in *Chisom v. Roemer,* 501 U.S. 380, 396–97, 111 S.Ct. 2354, 2364–65, 115 L.Ed.2d 348 (1991), that lack of opportunity to participate is as critical to a plaintiff class's Section 2 claim as the opportunity to elect. In *Chisom,*[26] the Supreme Court had explained that "the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." 501 U.S. at 397, 111 S.Ct. at 2365; *see Niagara Falls,* 65 F.3d at 1019–20; *Nipper,* 39 F.3d at 1512–13; *Clements,* 999 F.2d at 843; *Baird,* 976 F.2d at 359.

■■■■ The Court must therefore also engage in a careful examination of the "totality of the circumstances" surrounding a Section 2 vote dilution claim to determine whether plaintiffs have proven that they have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" to the Town Board. 42 U.S.C. § 1973; *see DeGrandy,* —— U.S. at ——––––, 114 S.Ct. at 2657–58; *Gingles* at 80, 106 S.Ct. at 2782; *White,* 412 U.S. at 766, 93 S.Ct. at 2339 (citing *Whitcomb,* 403 U.S. at 149–50, 91 S.Ct. at 1872–73); *Niagara Falls,* 65 F.3d at 1008; *Nipper,* 39 F.3d at 1513. Relevant to evaluating the totality of the circumstances are nine factors set out by the Senate Judiciary Committee in the Senate Report accompanying the 1982 amendments to the Voting Rights Act (the "Senate Report factors"). *DeGrandy,* —— U.S. at ——, n. 9, 114 S.Ct. at 2656, n. 9; *Gingles,* 478 U.S. at 44–5, 106 S.Ct. at 2762–64. These factors are:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise to participate in the political process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. at 28–9, 1982 U.S.C.C.A.N. at 206–7 (footnotes omitted); *DeGrandy,* —— U.S. at ——, n. 9, 114 S.Ct. at 2656, n. 9; *Gingles,* 478 U.S. at 44–5, 106 S.Ct. at 2762–64. Two additional factors may have limited relevance:

8. Whether there is a significant lack of responsiveness on the part of elected offi-

---

26. *Chisom* was before the Supreme Court solely on the issue of whether Section 2 coverage extended to judicial elections. Nothing in *Chisom* suggests that the Supreme Court intended to limit its observations on the meaning of Section 2 to judicial elections.

cials to the particularized needs of the members of the minority group; and

9. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous.

S.Rep. at 29; 1982 U.S.C.C.A.N. at 207; *De-Grandy*, —— U.S. at ——, n. 9, 114 S.Ct. at 2656, n. 9; *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763.

This list is "neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763. Rather, the test is intended to be a flexible, fact-bound, intensely local appraisal of the challenged electoral system based "upon a searching practical evaluation of the 'past and present reality' . . . and on a 'functional' view of the political process," *Id.* (quoting S.Rep. at 30, 1982 U.S.C.C.A.N. at 208); *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 980 (1st Cir.1995). Moreover, " 'there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other.' " *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763 (quoting S.Rep. at 29, 1982 U.S.C.C.A.N. at 207).

To summarize, in order for plaintiffs to prevail on their claim that the Town of Babylon's multimember district for Town Board elections abridges their right to vote "on account of race," plaintiffs must establish the three *Gingles* preconditions and demonstrate, based on the Senate Report factors and any other relevant considerations, that African–Americans in the Town of Babylon "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973. In assessing plaintiffs' claim, the Court must consider all relevant evidence, as "[n]o single statistic provides courts with a short-cut to determine whether a set of [electoral structures] unlawfully dilutes minority voting strength." *De-Grandy*, —— U.S. at —— – ——, 114 S.Ct. at 2661–62; *see Nipper*, 39 F.3d at 1514.

### B. *First Gingles Precondition*

Because the African–American population in the Town of Babylon constitutes only 14.94% of the Town's population and 13.3% of its voting age population and lives principally in three regions of the Town, this case raises a number of issues regarding the meaning of the first *Gingles* precondition requiring the minority population to be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766–67.

One issue concerns the number of single-member districts into which the Court may divide the current multimember district. To satisfy their burden of showing that a single-member district could be drawn in which African–Americans would constitute a majority, plaintiffs at trial sought to present districting plans based on four, five and six single-member districts.

The current Town Board consists of four Board members and the Town Supervisor. Since under state law the Supervisor is also the chief executive and administrative official for the Town, N.Y. Town Law §§ 52, 60 (McKinney 1987), the Supervisor's position is not susceptible to election from a single-member district position. If the Supervisor were elected from a specific district, that region would have a disproportionate political advantage in the Town's allocation of resources. Political reality, therefore, dictates that only four of the five currently existing seats may be elected from single-member districts.

The question remains whether plaintiffs may nevertheless insist that the size of the Town Board be increased beyond four if necessary to satisfy the first *Gingles* precondition. This question may be answered by examining the Supreme Court's decision in *Holder v. Hall*, —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994). In *Holder*, African–American plaintiffs challenged a single commissioner form of government in a rural Georgia county. *Id.* at ——, 114 S.Ct. at 2584. The African–American community, which constituted 20% of the county's population, obviously could not satisfy the first *Gingles* precondition if limited to the one seat in the existing system. The lower courts concluded that the first precondition had been met because the county's African–American community was sufficiently numerous and

geographically compact to constitute a majority in a single-member district if the size of the governing body were increased from one to five. *Id.*

The Supreme Court reversed. Five members of the Court for three different reasons were of the opinion that the size of a governing body is not subject to challenge under Section 2 of the Act. Justice Kennedy and Chief Justice Rehnquist were of the view that size was not a "practice or procedure" within the meaning of Section 2, *id.* at —— ——, 114 S.Ct. at 2587–88, and that no standards could be devised against which the dilutive effect of the size of a governing body could be measured, *id.* at ——, 114 S.Ct. at 2588. Justice Thomas, joined by Justice Scalia, agreed with both of these points but favored a broader holding that would reject the notion that Section 2 covers dilution challenges. *Id.* at ——, 114 S.Ct. at 2591 (Thomas, J., concurring in judgment). Justice O'Connor believed that the size of a governing body was a "practice or procedure" as defined by Section 2, *id.* at ——, 114 S.Ct. at 2589 (O'Connor, J., concurring in part and in the judgment), but agreed that there could never be an objective alternative benchmark for comparing the dilutive effects of the size of a governing body, *id.* at ——, 114 S.Ct. at 2589–90. "The wide range of possibilities makes the choice inherently standardless." *Id.* at ——, 114 S.Ct. at 2590. Justice O'Connor contrasted the absence of an appropriate benchmark in *Holder* from a case, such as the one at bar, challenging a multimember district. *Id.* at ——, 114 S.Ct. at 2589. In such a challenge, an appropriate benchmark for evaluating any dilutive effect of the multimember system would be "a system of multiple single-member districts." *Id.* at ——, 114 S.Ct. at 2589.

Thus, under *Holder,* a system of four single-member districts would clearly constitute a suitable benchmark against which to compare the dilutive effect of the current multimember system for electing the Babylon Town Board. None of the opinions of the five justices who voted for reversal in *Holder,* however, would permit plaintiffs in the instant action to argue for increasing the Town Board beyond its existing size of four.

"In its narrowest sense, *Holder* stands for the proposition that when challenging the numerical size of a multimember, collegial [governing body], a plaintiff may not, absent a 'benchmark', posit a hypothetical expansion of the size of that multimember body." *Concerned Citizens for Equality v. McDonald,* 63 F.3d 413, 417 (5th Cir.1995). Otherwise, the "use of hypotheticals would nullify the first prong [of *Gingles* ], for whenever the first *Gingles* prong presented a problem, a plaintiff would only need to hypothesize some other political structure under which the first *Gingles* precondition would be met." *McDonald,* 63 F.3d at 417; *accord McNeil,* 851 F.2d at 946–47 (in declining to "order the creation of additional seats to the park and school boards to enable black voters to satisfy the threshold requirement," court noted that "[i]t is not reasonable to add seats ... essentially to create a section 2 violation").

Thus, in order to employ a five or six single-member district plan as a benchmark, the plan would have to be derived from some objective and workable standard. Plaintiffs have proffered no standard whatsoever, much less an objective and workable one, for using such a plan as a benchmark. New York State law does permit the number of single-member districts to be increased to six or decreased to two, but only if the change is made by Town referendum. N.Y.Town Law § 81 (McKinney 1987). The voters of the Town of Babylon have not spoken on this issue. Without any other basis to select a five or six single-member district plan, the Court's comparison of the current multimember system to such a plan would be arbitrary.

*McDonald* confirms that the Court's use of a five or six single-member district plan in this case would be contrary to *Holder.* In *McDonald,* 63 F.3d at 414, a citizen's group brought an action against the County Commissioners of Orange County, Texas, alleging that the four-precinct single-member structure for electing constables and justices of the peace in Orange County diluted African–American voting strength. The citizen's group attempted to argue that the Texas Constitution's statement that "for the convenience of the people," counties with populations of 30,000 or more "shall be divided into

not less than four and not more than eight" precincts provided a benchmark for increasing the number of precincts. *Id.* at 418. The Fifth Circuit rejected this argument, finding that the proposed "convenience of the people" standard did not provide an objective and workable standard by which to evaluate the dilutive effects of the four-precinct system. *Id.* Accordingly, the minority group's proposed five-precinct model did not pass muster under *Holder. Id.*

In the case at bar, state law does not provide even this semblance of a standard. Accordingly, the Court concludes that plaintiffs cannot satisfy the first *Gingles* precondition by presenting evidence of their ability to create a majority-minority district in a five or six single-member district scheme. "Voting rights plaintiffs may not employ a self-serving thought experiment to leap-frog one of the 'necessary' Gingles preconditions." *Id.* at 417. Plaintiffs must proffer a suitable four single-member district plan in order to carry their burden under the first *Gingles* precondition.

■■■ Defendants argue that if a four single-member district scheme is to be employed as the benchmark against which to assess the dilutive effects of the current multimember system, plaintiffs cannot prevail under the first *Gingles* precondition of numerosity since such a plan would give the African–American community voting strength well in excess of their numbers. If the Court were to grant relief to plaintiffs, the Town's African–American populace, constituting only 13.3% of the voting age population, would be able to command 25% of the Town Board's seats, a percentage approximately 88% greater than their numerical strength would allow.[27] Defendants contend that implicit in the notion of vote dilution is the assumption that the group claiming dilution will have numbers equal to what they term "a seat's worth" of the electorate. In other words, a minority group may not be found to have passed the first *Gingles* precondition of numerosity where the proposed

legislative body would be composed of four members, each to be elected from a single-member district containing one-fourth of the population, unless the minority group constituted at least 25% of the jurisdiction's total population. Defendants acknowledge that they have no direct appellate authority to support this argument. Defendants contend, however, that indirect support for their position can be found in *Whitcomb,* 403 U.S. 124, 91 S.Ct. 1858, and *DeGrandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775.

Defendants cite in their favor the Supreme Court's statement in *Whitcomb* that the district court's holding in that case would taken to the extreme, mean that "any group with distinctive interests must be represented in legislative halls *if it is numerous enough to command at least one seat* and represents a minority living in an area sufficiently compact to constitute a single-member district." 403 U.S. at 156, 91 S.Ct. at 1875 (emphasis added). The Supreme Court's reference to "command[ing] at least one seat," however, could easily be construed as another way of describing groups that would constitute a majority in a single member district. Surely defendants cannot expect the Court to adopt a new interpretation of the first *Gingles* precondition on the basis of such a vague and inconclusive statement.

*DeGrandy,* involving a Section 2 vote dilution challenge to Florida's reapportionment plan for its single-member state legislative districts, presents a more difficult question. *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2651, held that substantial proportionality barred a Section 2 vote dilution claim by Hispanics where there was a history of discrimination and a two percentage point difference between the percentage of Hispanics in the voting population (47%) and the percentage of Hispanic-majority districts (45%). The Supreme Court rejected the claim that minority groups were entitled to every majority-minority district that could be created to compensate for racially polarized voting

---

**27.** The formula for calculating this claimed over-representation is taken from *DeGrandy,* —— U.S. at ——-–—— and n. 13, 114 S.Ct. at 2659–60 and n. 13. It is as follows: 25% (control over one seat) *minus* 13.3% (% of African–American voting age population) *equals* 11.7%. 11.7% *divided by* 13.3% *equals* approximately 88% (degree by which African–American voting strength would exceed numerical strength).

and past discrimination. *Id.* at —— – ——, 114 S.Ct. at 2659–60. The Court emphasized that "[o]ne may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at ——, 114 S.Ct. at 2660.

While substantial proportionality barred the Section 2 vote dilution claim in *DeGrandy*, the Supreme Court emphasized that proportionality is only one factor to consider and is not a "safe harbor" that automatically defeats a claim of vote dilution. *Id.* at ——, 114 S.Ct. at 2659. Rather, the ultimate question is whether the result of manipulation of district lines, "interact[ing] with social and historical conditions impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Id.* at ——, 114 S.Ct. at 2655 (internal quotations and citation omitted).

In *DeGrandy*, the Hispanic population already constituted a majority in single-member districts in proportion to its population. In the case at bar, on the other hand, the African–American community in Babylon has no such representation. *DeGrandy* 's admonition that Courts and governing bodies should not focus on proportionality to the exclusion of the broader factors, therefore, has even greater applicability here where there are no safe majority-minority districts.

Accordingly, the Court declines to infer from *DeGrandy* that merely because plaintiffs would achieve voting strength in excess of their numbers if relief were granted, they have failed to satisfy the first *Gingles* precondition of numerosity. Indeed, at least one appellate court has granted a minority group relief under Section 2 where the minority group constituted a smaller proportion of the total population (11%) than its resulting voting strength after the granting of relief

(20%). *See Solomon v. Liberty County,* 899 F.2d 1012, 1013 (11th Cir.1990) (*en banc* ), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991).

■ Given the African–American community's size and geographical distribution, creating a majority African–American district in a four-member plan is not a simple task. To form a majority of the population in one of the four districts requires over 12.5% of the Town's total population (*i.e.,* more than 25,-361 people). It would not, however, be enough to include slightly over 12.5% of the African–American population in the district since the first *Gingles* precondition require that the minority group constitute, at a minimum, a majority of the district's voting age population. *See, e.g., Westwego Citizens,* 946 F.2d at 1116 n. 7; *Solomon,* 899 F.2d at 1018; *McNeil,* 851 F.2d at 944–45; *League of United Latin American Citizens v. North East Indep. School Dist.,* 903 F.Supp. 1071, 1083–84 (W.D. Texas 1995); *cf. Smith v. Brunswick County, Virginia,* 984 F.2d 1393, 1401–02 (4th Cir.1993) (noting that when minority becomes voting majority in single-member district, "it is empowered with the vote in that district").[28] Since, as the lower African–American voting age population statistic evidences, more African–Americans than whites in the Town of Babylon are younger than 18 years old, to form a district that is majority African–American in voting age population would require a greater proportion of the overall African–American population. Indeed, if exact population equality among the districts were the goal, a minimum of about 94% of the entire African–American population of the Town would need to be placed in a single district in order for African–Americans to constitute a majority of the district's voting age population.

**28.** Plaintiffs' expert Lewis conceded to having offered the opinion in the redistricting of the Nassau County legislature that an effective majority-minority district in New York required a total minority population of 70% to 80%. Given the Court's disposition of the first *Gingles* precondition, the Court declines to address whether having a majority-minority district in which the minority's candidate of choice is actually capable of being elected is relevant in determining Section 2 liability or is only a consideration in draw-

ing the minority district after liability has been found to exist. *See Magnolia Bar Ass'n, Inc. v. Lee,* 793 F.Supp. 1386, 1397 (S.D.Miss.1992) (noting that "[i]n voting rights cases where only a bare [voting] majority district can be created, the majority threshold requirement and the supermajority remedial emphasis leave courts in a quandary"), *aff'd,* 994 F.2d 1143 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993).

Underpopulating the minority district (*i.e.*, including less than one-quarter of the Town's population in the district) would make plaintiffs' effort to satisfy the first *Gingles* precondition somewhat easier. The question at hand is the degree of adherence to population equality required of plaintiffs' proposed districting plans. Plaintiffs argue that the qualifying minority district may be underpopulated so long as the total deviation within the remedial plan does not exceed 10%. Total deviation is determined by adding together the percentage deviation from ideal of the most overpopulated and most underpopulated districts, ignoring their signs. *See e.g., Connor v. Finch*, 431 U.S. 407, 416–17, 97 S.Ct. 1828, 1834–35, 52 L.Ed.2d 465 (1977). A deviation below 10% in a plan devised by a state or local governing body would be permissible. *Voinovich*, 507 U.S. at 160–62, 113 S.Ct. at 1159; *Connor*, 431 U.S. at 418, 97 S.Ct. at 1835–36; *Garza v. County of Los Angeles*, 918 F.2d 763, 773 (9th Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991).

Defendants argue that since the Court may ultimately have to order a remedy in this case, the total deviation must meet the more stringent "de minimis" deviation requirement applicable to court-ordered plans. *Connor*, 431 U.S. at 414, 97 S.Ct. at 1833 (quoting *Chapman*, 420 U.S. at 26–27, 95 S.Ct. at 766). Although the term *de minimis* in the context of court-ordered plans does not requires the near-population equality applicable to federal congressional districting, the Supreme Court has refused to state whether even a deviation of 5.95% would be satisfactory in a court-ordered plan. *Connor*, at 418 n. 17, 97 S.Ct. at 1835 n. 17. Only "[w]here important and significant state considerations rationally mandate departure from" the *de minimis* standard, can a court-ordered plan with greater than *de minimus* population deviation still be adopted. *Chapman*, 420 U.S. at 26–7, 95 S.Ct. at 766.

The Court concludes that requiring plaintiffs to meet the *de minimis* standard would be unduly onerous. If the Court were to find plaintiffs to be entitled to a remedy under Section 2, the Court would give the Town Board the first opportunity to construct an acceptable four-member single district plan. *See McDaniel v. Sanchez*, 452 U.S. 130, 149 n. 30, 101 S.Ct. 2224, 2236 n. 30, 68 L.Ed.2d 724 (1981) ("Our prior decisions in the apportionment area indicate that, in the normal case, a court that has invalidated a State's existing appointment plan should enjoin implementation of that plan and give the legislature an opportunity to devise an acceptable replacement before itself undertaking the task of reapportionment.... Judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." (citing cases) (internal quotations omitted)); *Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438 (11th Cir. 1987), *cert. denied*, 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988). New York state law would ordinarily require any redistricting by the Town Board to be submitted to referendum. *See* N.Y.Town Law § 81 (McKinney 1987). If the Town did not submit the redistricting plan to referendum and the Court accepted the plan, it could be argued that the plan was court-ordered since would not have met state law requirements for a legislatively drawn plan. The Supreme Court, however, has ruled in a voting rights case brought under Section 5 of the Act, 42 U.S.C. § 1973(c), that a plan drawn by a governing body would still be considered to be legislatively drawn whether or not that plan complied with state law requirements for passage. *McDaniel*, 452 U.S. at 152, 101 S.Ct. at 2237–38. "[T]he essential characteristic of a legislative plan is the exercise of legislative judgment. The fact that particular requirements of state law may not be satisfied before a plan is proposed to a federal court does not alter this essential characteristic." *Id.* (citing *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) (Powell, J., concurring)). The Supreme Court further reasoned that the outcome in a voting rights case is "a matter of federal law that federal courts should determine pursuant to a uniform federal rule" and should not be subject to change depending on state law requirements. *Id.*

Concluding that "we simply do not believe the Supreme Court would adopt different

definitions of 'legislatively enacted' for purposes of section 2 and section 5," the Eleventh Circuit has applied *McDaniel* to a Section 2 action to find a redistricting scheme drawn by a Florida county to be a legislative plan not subject to the requirements imposed on court-ordered plans, even where the county did not have authority on its own to implement the plan without a referendum. *Tallahassee Branch of NAACP,* 827 F.2d at 1438, 1440; *see also Kimble v. County of Niagara, NY,* 826 F.Supp. 664, 670 (W.D.N.Y.1993) (where county plan was proposed by way of settlement of lawsuit rather than through ordinary legislative process, court still used 10% population deviation standard applicable to legislatively enacted plans). Finding this precedent and reasoning convincing, the Court concludes that any plan submitted by the Town Board would be considered legislative in nature.

Therefore, only if the Town Board failed to submit a plan or proffered to the Court an inadequate plan would the Court be forced to impose its own remedy. Under those circumstances, the plan would be considered court-ordered and have to comply with the stricter population deviation standard. Plaintiffs should not, however, be required to present to the Court a plan that contemplates that contingency in order to satisfy the first *Gingles* precondition. It would be unfair to force plaintiffs to satisfy a higher burden because of the risk that defendants may decide not to comply with a court order.

There is, moreover, no precedent for defendants' position. On the other hand, while not specifically addressing the issue, the court in *Cousin,* 904 F.Supp. at 688, found plaintiffs to have met the first *Gingles* precondition, and granted relief under Section 2, based on a proposed redistricting plan that met the population deviation rule applicable to legislative plans. That court then directed the Tennessee state legislature to make the first attempt to devise a remedial plan. *Id.* at 714.

With the understanding that plaintiffs do not have to meet the stricter population deviation standard for court-ordered plans, the Court turns to the two four single-member district plans that plaintiffs introduced at trial. On the third day of trial, plaintiffs presented a four-member plan having one district in which African–Americans constituted 51.91% of the voting age population. (Pl.Exh. 5A.) The minority district however, contained 3,647 fewer people than that required for an ideal district and thus was underpopulated by 7.19%.[29] The most populated of the remaining three districts was overpopulated by 2.4%, thus producing a total deviation in the plan of 9.59%. This plan's total population deviation thus was within the margin permitted in legislatively drawn plans.

On the fifth day of trial, the plaintiffs produced another four single-member district plan (Pl.Exh. 8) which was a modification of the plan discussed above (Pl.Exh. 5A). In this plan (Pl.Exh. 8), the minority district was modified by the addition of population so that it was underpopulated by only 1,557 persons. African–Americans were 50.01% of the modified district's voting age population. The total deviation for the new plan was 4.01%. The effort to decrease the deviation from population equality resulted in the drawing of districts more convoluted in character than those in plaintiffs' first four single-member district plan (Pl.Exh. 5A). Given the Court's ruling on population deviation, plaintiffs did not need to proffer this more problematic plan. The Court will therefore focus its remaining analysis of the first *Gingles* precondition on the first four-member plan, Pl.Exh. 5A, that plaintiffs offered into evidence.

 Plaintiffs contend that once the one-person, one-vote requirement has been met, they need only show that it is physically possible to draw a district in which African–Americans are a majority of the voting age population in order to pass the first *Gingles* precondition. Plaintiffs' interpretation of "geographically compact" thus means nothing more than it is possible to place a sufficient number of a minority group in the same district.

---

29. The Town's total population is 202,889. Dividing this number by 4 yields 50,722 people.

Plaintiffs proposed minority district contained only 47,075 persons.

Plaintiffs' position is significantly undercut by the Supreme Court's decisions in *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) and *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). *Shaw,* 509 U.S. at —— – ——, 113 S.Ct. at 2819–20, and *Miller,* —— U.S. at —— – ——, 115 S.Ct. at 2483–84, involved challenges to North Carolina's and Georgia's decisions, respectively, to create additional majority African–American congressional districts in order to obtain preclearance from the Attorney General of the United States under Section 5 of the Act. These cases held that a plaintiff challenging districting legislation states a cognizable claim under the Fourteenth Amendment's Equal Protection Clause where he or she can show, "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller,* —— U.S. at ——, 115 S.Ct. at 2488; *see Shaw,* 509 U.S. at ——, 113 S.Ct. at 2832. "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller,* —— U.S. at ——, 115 S.Ct. at 2488. If race is found to be the "predominant, overriding factor explaining" the districting legislation, then the districting "cannot be upheld unless it satisfies strict scrutiny," that is, the districting must be "narrowly tailored to achieve a compelling interest." *Id.* at ——, ——, 115 S.Ct. at 2481, 2490; *see Shaw,* 509 U.S. at ——, 113 S.Ct. at 2832. The Supreme Court declined to decide "[w]hether or not in some cases compliance with the Voting Rights Act, standing alone, can provide a compelling interest." *Miller,* —— U.S. at ——, 115 S.Ct. at 2490; *see Shaw,* 509 U.S. at —— – ——, 113 S.Ct. at 2830–31.

Thus, although the districting plans in both *Shaw* and *Miller* are factually distinguishable from the instant action in that they did not arise out of a Court finding of a voting rights abridgement, both cases imply that, even assuming compliance with the Voting Rights Act would be a compelling interest, a race-based remedial measure to correct a Section 2 violation would, at a minimum, have to be narrowly tailored to that goal. *Cf. Harvell v. Blytheville School District # 5,* 71 F.3d 1382, 1391 (8th Cir.1995) (sounding "a cautionary note to the district court on remand to steer clear of the type of racial gerrymandering proscribed in *Miller,* while keeping in mind the need to vindicate the rights of the minority voters"). It follows that a plaintiff seeking to meet its burden of showing compactness under the first *Gingles* precondition should not be permitted to rely on a plan which, if subsequently adopted by the Court after a finding of a Section 2 violation, would have no chance of being found to be narrowly tailored to redress the violation. *Cf. Clark v. Calhoun County,* 21 F.3d 92, 96 n. 2 (5th Cir.1994) (noting that a district court "should make sure that any remedial plan is narrowly tailored to correct any § 2 violation found to exist").

Accordingly, although there is no equal-protection challenge involved in the present case, plaintiffs must, in order to meet their burden of proof under the first *Gingles* precondition, either proffer a districting plan which does not subordinate racial considerations to traditional districting principles, including compactness, contiguity, conformance with geographic boundaries and respect for political subdivisions or communities, or justify the need for such subordination. *See Cane v. Worcester County, Maryland,* 35 F.3d 921, 927 (4th Cir.1994) (noting applicability of *Shaw* to first *Gingles* precondition and finding plaintiffs' plan to have met precondition even where plan split political subdivisions since minority district was similar in shape to a former district and plan conformed to traditional districting principles of conformance with natural boundaries and respect for shared socioeconomic and political concerns), *cert. denied,* —— U.S. ——, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995); *Jeffers v. Tucker,* 847 F.Supp. 655, 661 (E.D.Ark. 1994) (three-judge court) (satisfaction of first *Gingles* precondition requires that plan be consistent with *Shaw* ); *Sanchez v. State of*

*Colorado,* 861 F.Supp. 1516, 1523 (D.Colo. 1994) (noting that principles of *Shaw* apply to vote dilution claim and that therefore consideration of race may not be to "the exclusion of all traditional nonracial districting principles," including respect for region's geography, political subdivisions and precinct boundaries); *Marylanders for Fair Representation v. Schaefer,* 849 F.Supp. 1022, 1053–55 (D.Md.1994); *cf. Clark,* 21 F.3d at 95–96 (declining to decide whether a district plan that would enable a group of plaintiffs to state a claim under the Equal Protection Clause would necessarily flunk the *Gingles* compactness test). Thus, while plaintiffs in the case at bar may, and in fact must, take race into account in order to construct a district that is majority African–American in voting age population, *see Shaw,* 509 U.S. at ——, 113 S.Ct. at 2826; *Cane,* 35 F.3d at 927; *Sanchez,* 861 F.Supp. at 1523, they may not simply string together the Town's African–American population.

■ Plaintiffs' expert Lewis conceded at trial that his sole considerations in drawing the four-member plan were to produce a district with an African–American voting age majority and a plan having less than a 10% total deviation from population equality. Lewis acknowledged that he made no attempt to address other districting criteria. He made no effort whatsoever to take into account physical boundaries, political subdivisions such as villages and hamlets or existing election district lines. Lewis blamed his failure to consider key districting criteria in part on the limited time he was given to draw the districting plan. The Court finds this explanation unsatisfactory. The instant action has been pending since 1988, and plaintiffs were aware for many months of the trial date.

Plaintiffs' failure to give any regard to key districting criteria in drawing their plan is in and of itself sufficient grounds for the Court to conclude that plaintiffs have failed to carry their burden under the first *Gingles* precondition. Plaintiffs need not produce the ideal districting plan in order to satisfy the first prong of *Gingles, see Clark,* 21 F.3d at 95; yet, they should have done more than draw a plan based almost exclusively on racial considerations with no concern for key districting criteria. At the very least, they should have made an effort to assure the Court through discussion of the Town's topography, political subdivisions, communities and electoral districts that the plan did, or could be adjusted to conform, with traditional districting criteria. Plaintiffs' plan and accompanying explanations gave the Court no confidence that it could "fashion a remedy for a demonstrated abridgement" of Section 2. *Nipper,* 39 F.3d at 1510–11. Furnishing the Court with such confidence is the essence of the first prong of the *Gingles* analysis. *Nipper,* 39 F.3d at 1510–11. In light of *Miller* and *Shaw,* it would be questionable, at best, whether plaintiffs' plan, devised with so little attention to traditional districting criteria and with race as the near-sole consideration, could be adopted by the Court as a remedy, were a Section 2 violation to be found, and survive strict scrutiny in an Equal Protection clause challenge.

That plaintiffs' four single-member district scheme cannot be held to satisfy the first prong of *Gingles* is confirmed by examination of its construction. The plan was devised using census blocs, which are the smallest units of census geography for which population is reported.[30] The districts' boundaries were superimposed on a census tract map. The majority-minority district, District 1, joins together the three African–American population concentrations located in the Wyandanch and Wheatley Heights area, North Amityville and a portion of Deer Park. District 1 thus sprawls across the Town, beginning at its western border, going up to the northern border, and then to the eastern border.

In order to avoid cutting off white populations in the northwest and northeast corners of the Town, narrow corridors were carved out between the minority district and the

---

**30.** In 1990, the Census Bureau reported the nation's population for every closed polygon, *i.e.,* any geographic area that could be defined by streets, roads, natural boundaries, such as rivers, or by boundaries of political subdivisions. These closed polygons are called "census blocs" and are aggregated to form "census tracts." Census tract boundaries often follow major landmarks, such as streets and highways, whereas every city block constitutes a separate census bloc.

Town's borders. As a consequence, District 2 is convoluted in shape. It wraps around District 1, and consists of three geographic areas separated from each other by District 1. Only the narrow corridors mentioned above provide contiguity for the three areas. The corridor on the northern Town boundary is a mere 824 feet wide. The corridor on the eastern boundary appears from physical examination of the sketchy map provided, to be nearly the same in width. Thus, the manner in which District 1 was drawn results in District 2 being barely contiguous.

Plaintiffs' expert Lewis created a number of protrusions from District 1 into the remaining districts. These protrusions may reflect the tension between plaintiffs' efforts to increase District 1's population in order to avoid too large a deviation from population equality and the need to maintain a majority African–American voting age population. Whatever their purpose, these protrusions are not so oddly shaped as alone to render District 1 not compact. *Cf. Jeffers,* 847 F.Supp. at 662 (peculiar shape of district, including extension of "a series of long, slender fingers," while "nowhere nearly so unusual in shape as the ... district at issue in *Shaw,*" was one basis on which district was found not to be compact). No evidence was introduced, however, to assure the Court that District 1 was similar in shape to any existing legislative or other district in Suffolk County. *See Cane,* 35 F.3d at 927 (noting that odd shape of a district can be justified if similar in appearance to existing districts in the region); *Marylanders,* 849 F.Supp. at 1053.

According to defendants, the districts do not tend to follow what the Town's citizens would consider to be conventional physical boundaries, *e.g.,* rivers or expressways. Plaintiffs made no effort to rebut this claim. The Court is unable to make this determination on its own since plaintiffs' plan was not drawn on a map showing the Town's topography.

■ The four districts also cut through a number of the Town's election districts. Since the Court was only provided with a map showing the proposed districts superimposed on census tracts and the parties' energies were directed at the second four-member district plan (Pl.Exh. 8) rather than the one under consideration, the Court is unable to ascertain the exact number of election districts that were split. Any splitting would necessitate redrawing of the divided election districts and nearby districts to equalize the population among them. The cost and effort that such redrawing would involve was not specified. While administrative convenience alone should not be a basis for rejecting a plan under the first *Gingles* precondition, *Marylanders,* 849 F.Supp. at 1056 n. 53, it is significant that redrawing of election districts appears not to be something that is taken lightly in Suffolk County. Precisely because of the expense and effort required, the Suffolk County legislature, in its last redistricting, worked to avoid splitting election districts. Very few, if any, election districts were split in the entire county.

Given the zigzagging nature of the four districts and that plaintiffs' plan was not drawn on a map showing the political subdivisions of the Town, it is impossible to ascertain to what extent the districts cut through the Town of Babylon's villages and hamlets. Since plaintiffs did not, in any event, consider this factor in drawing District 1, the Court doubts that the integrity of the Town's villages and hamlets has been respected. This is problematic, as the testimony adduced at trial attested to the strong identification and allegiance of the Town's citizens with the village or hamlet in which they live. *See Jeffers,* 847 F.Supp. at 662 (plaintiffs' plan was inconsistent with "spirit of *Shaw,*" and first *Gingles* precondition was therefore not satisfied, where proposed districts "cut across numerous communities and political boundaries"). Indeed, Bachety testified that dividing the Town's villages or hamlets was contrary to existing practice in Suffolk County legislative redistricting where attempts had been made in the past to observe village lines.

Based on this findings, the Court declines to find that plaintiffs have met their burden of proof of showing that their districting plan, drawn with a near-exclusive focus on race, by chance adequately takes into account districting criteria such as compactness, re-

spect for the Town's geography, contiguity and the integrity of political subdivisions and communities of interests. Accordingly, the first prong of *Gingles* has not been met. This ruling is fatal to plaintiffs' case. Since the remaining issues were tried, however, the Court will address them in turn.

### C. *Political Cohesiveness of the African–American Community*

■ Defendants have conceded that African–Americans in the Town of Babylon are politically cohesive in that a substantial majority of African–Americans support the nominees of the Democratic party. In the elections examined by the parties' experts, other than the 1990 District Court election where Lewis had no data for the voting pattern of African–American voters, African–Americans were most cohesive in their support of African–American Democrats, but in every contest, save one, they also provided majority support to white Democrats. The one exception to this pattern was the African–American community's support of Judge Floyd, the African–American Republican candidate in the 1989 Supreme Court race, over one or more of the white Democratic candidates. In other elections, lay testimony revealed that African–Americans supported white Democrats over African–American Republicans. Overall, the African–American community tended to be unified in its support of one or more candidates for office.

### D. Racial Bloc Voting

■ This last threshold factor has been termed the "essence of a vote dilution claim because, to be actionable, the electoral defeat at issue must come at the hands of a cohesive white majority." *Nipper*, 39 F.3d at 1533. In making a finding on this final threshold factor, the Court must consider whether white voters in the Town of Babylon vote in a manner that usually defeats the choice of minority voters. *See Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769; *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir.1994) (quoting *Gingles*, 478 U.S. at 49, 106 S.Ct. at 2766), *cert. denied*, —— U.S. ——, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995). " '[I]n general, a white bloc vote that normally will defeat the combined strength of minority support plus white crossover votes rises to the level of legally significant white bloc voting.' " *Niagara Falls*, 65 F.3d at 1007 (quoting *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769) (internal quotations omitted); *accord Nipper*, 39 F.3d at 1533 n. 76 (quoting same passage in *Gingles*).

■ The critical question arising in this case is whether the Court must, as defendants argue, also be satisfied that any white bloc voting in the Town of Babylon arises from racial bias in the community rather than from partisan politics. Although the Second Circuit has acknowledged the ongoing debate over "the extent to which plaintiffs must prove racial bias to prevail under § 2, or, similarly, whether they must disprove that it is partisan politics—not racial bias—that accounts for the alleged deprivation of minorities' rights to enjoy equal opportunities in political participation," *Niagara Falls*, 65 F.3d at 1015 (citing *Clements*, 999 F.2d at 861; *Baird*, 976 F.2d at 361), the issue has not been decided in this circuit.

The distinction between bloc voting attributable to partisan politics and that arising from racial bias originated in *Whitcomb*, 403 U.S. 124, 91 S.Ct. 1858, and *White*, 412 U.S. 755, 93 S.Ct. 2332, two racial vote dilution cases involving constitutional challenges. In *Whitcomb*, 403 U.S. at 135, 91 S.Ct. at 1865, the lower court had held that plaintiffs, African–American residents of Marion County, Indiana, had established that their voting strength had been diluted in state legislative elections. The lower court found that plaintiffs were a cognizable minority with political interests that differed from those of the white majority and that the at-large election structure prevented them from electing their share of the county's representatives to the state legislature. *Id.* at 134–35, 91 S.Ct. at 1864–65. The Supreme Court reversed, concluding that cognizable minority status, plus a lack of proportional representation, did not equate to vote dilution. *Id.* at 148–49, 91 S.Ct. at 1871–72. The Court found nothing in the record to support that African–Americans "were not allowed to register to vote, to choose the political party they desired to support, to participate in its affairs or to be

equally represented on those occasions when legislative candidates were chosen." *Id.* at 149, 91 S.Ct. at 1872. The Court concluded that African-American-supported candidates lost not because of their identification with the African–American community but because they were Democrats in a Republican county. *Id.* at 152–53, 91 S.Ct. at 1873–74. The lower court's finding that the "voting power" of the African–American community "may have been 'cancelled out' . . . seems a mere euphemism for political defeat at the polls." *Id.* at 153, 91 S.Ct. at 1874.

In *White*, the Supreme Court confronted very different circumstances. African–Americans in one county and Hispanics in another were successful in attacking multi-member districts in the reapportionment scheme for the Texas House of Representatives. The Supreme Court agreed with the lower court that vote dilution was present where African–Americans and Hispanics had been excluded from the political process leading to the nomination and election of representatives, Texas had a long history of official discrimination and various election procedures in place enhanced the opportunity for racial discrimination. *White*, 412 U.S. at 766, 767, 769, 93 S.Ct. at 2339, 2340, 2341. Thus, the Supreme Court concluded in *Whitcomb* that no constitutional violation existed where minority-preferred candidates lost for normal political reasons, whereas in *White* such a violation was found to exist where such losses were attributable to the exclusion of the Hispanic community from "effective political participation in political life." *Whitcomb*, 403 U.S. at 158, 91 S.Ct. at 1877; *see White*, 412 U.S. at 769, 93 S.Ct. at 2341; *see also Shaw*, 509 U.S. at ——, 113 S.Ct. at 2835 (White, J., dissenting) (where Justice White, author of both the *Whitcomb* and *White* opinions, reiterated that the central point of these cases is that "it is not mere suffering at the polls but discrimination in the polity with which the Constitution is concerned").

Two recent vote dilution cases, one from the Fifth Circuit, sitting *en banc*, involving Texas' county-wide method for electing state trial judges, and the other from the Eleventh Circuit, also sitting *en banc*, challenging the at-large elections for certain trial judges in Florida, have considered at length the distinction set out in *Whitcomb* and *White* and found it to remain viable. *Clements*, 999 F.2d at 853 ("The principles announced and applied in *Whitcomb* and *White* are instructive and, we believe, controlling."); *see Nipper*, 39 F.3d at 1517. In *Clements*, 999 F.2d at 850, the Fifth Circuit directly confronted whether proof that partisanship rather than racial bias was the cause of bloc voting would prevent a finding of legally significant racial bloc voting under the third *Gingles* precondition. In *Nipper*, the Eleventh Circuit considered the similar but broader question of whether "section 2 liability turn[s] on the existence of racial bias in the community interacting with the challenged electoral scheme to dilute the voting strength of the minority plaintiffs." *Nipper*, 39 F.3d at 1525 n. 62.

The Fifth Circuit carefully examined the legislative history to the enactment of Section 2 and found that the Senate Report incorporated the distinction in *Whitcomb* "between built in bias and political defeat at the polls." *Clements*, 999 F.2d at 855 (internal quotations omitted). Relevant to concluding that Congress intended this distinction was the Senate Report's quoting of *Whitcomb* 's statement that " '[t]he failure of the ghetto to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias against poor Negroes. The voting power of ghetto residents may have been 'cancelled out' as the District Court held, but this seems a mere euphemism for political defeat at the polls.' " *Clements*, 999 F.2d at 855 (quoting S.Rep. at 21 (quoting *Whitcomb*, 403 U.S. at 153, 91 S.Ct. at 1874), 1982 U.S.C.C.A.N. at 198). The Fifth Circuit also noted that "[i]n keeping with *Whitcomb*, the Senate Report equated 'racial bloc voting' with proof that 'race is the predominant determinant of political preference.' " *Clements*, 999 F.2d at 862 (quoting S.Rep. at 33, 1982 U.S.C.C.A.N. at 211).

The Eleventh Circuit concurred that Congress, in amending Section 2, intended a distinction between losses caused by racial bias and those resulting from ordinary poli-

tics. The Eleventh Circuit emphasized the Senate Report's language that "'under the results test, the courts distinguished between situations in which racial politics play an excessive role in the electoral process, and communities in which they do not.'" *Nipper,* 39 F.3d at 1522 (quoting S.Rep. at 33, 1982 U.S.C.C.A.N. at 211); *accord Clements,* 999 F.2d at 855. References throughout the Senate Report to overturning the Supreme Court's intent requirement enunciated in *Bolden* should be "read to refer to the intent of those responsible for erecting or maintaining the challenged scheme" rather than to "a basic inquiry into racial bias in the voting community—an inquiry that is qualitatively different from the question whether a challenged election law or procedure was designed or maintained for a discriminatory purpose." *Nipper,* 39 F.3d at 1522; *see Clements,* 999 F.2d at 862.

The text of Section 2 itself supports the conclusion that differences in voting patterns between whites and African-Americans that are explainable more by partisanship than by racial bias should not give rise to a viable vote dilution claim. Despite the breadth of the portion of Section 2(b) stating that a violation is established if a minority group has "less opportunity" to "participate in the political process and to elect representatives of their choice," the language in Section 2(a) that "no voting ... practice ... shall be imposed ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color" and the statement in Section 2(b) that no group has a right to proportionate representation bolster the view that mere losses at the polls are insufficient to justify a remedy under Section 2. 42 U.S.C. § 1973; *see Nipper,* 39 F.3d at 1515–16; *Clements,* 999 F.2d at 850 ("The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections, as the text of § 2 suggests, extend only to defeats experienced by voters 'on account of race or color.'"); *Vecinos De Barrio Uno,* 72 F.3d at 981. Any other reading "might well render section 2 outside the limits of Congress' legislative powers and therefore unconstitutional," *Nipper,* 39 F.3d at 1515; *see* S.Rep. at 41–3, 1982 U.S.C.C.A.N. at 219–21; *Clements,* 999 F.2d at 854, for "the Voting

Rights Act was adopted pursuant to Congress' authority to enforce the Fourteenth and Fifteenth Amendments" which "were designed to remedy pervasive racial discrimination," *Nipper,* 39 F.3d at 1515–16; *see Clements,* 999 F.2d at 854.

Construing the third *Gingles* precondition to require more than a showing that African-Americans and whites vote differently runs counter to the description of this threshold by Justice Brennan, author of the *Gingles* opinion. *See Nipper,* 39 F.3d at 1520 n. 52. Justice Brennan was of the view that "[i]t is the difference between the choices made by blacks and whites—and not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives." *Gingles,* 478 U.S. at 63, 106 S.Ct. at 2773. Justice Brennan's holding with respect to the third precondition, however, did not have the support of a majority of the Justices. "Both Justice White and Justice O'Connor were united in their fidelity to *Whitcomb* 's distinction between vote dilution and partisan politics and in their opposition to Justice Brennan's attempt to expunge this teaching from the bloc voting inquiry." *Clements,* 999 F.2d at 856; *see Gingles,* 478 U.S. at 83, 106 S.Ct. at 2783 (White, J., concurring), at 100–01, 106 S.Ct. at 2792–93 (O'Connor, J., joined by Burger, C.J., Powell and Rehnquist, JJ., concurring). In her opposition to Justice Brennan's approach, Justice O'Connor stated,

> The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of all evidence concerning voting preferences other than statistical evidence of racial voting patterns. Such a rule would give no effect whatever to the Senate Report's repeated emphasis on 'intensive racial politics,' on 'racial political considerations,' and on whether 'racial politics ... dominate the electoral process' as one aspect of the 'racial bloc voting' that Congress deemed relevant to showing a § 2 violation.

*Gingles,* 478 U.S. at 101, 106 S.Ct. at 2792 (O'Connor, J., concurring) (quoting S.Rep. at 33–34, 1982 U.S.C.C.A.N. 211–12). Justice White, writing separately, gave an example that suggested that he would consider signifi-

cant in deciding whether a plaintiff had satisfied the third *Gingles* precondition that partisan affiliation rather than race were driving election returns. *See Gingles,* 478 U.S. at 83, 106 S.Ct. at 2783 (White, J., concurring); *see Nipper,* 39 F.3d at 1514 n. 43. The Court in *Gingles* was thus "sharply divided on the crucial, separate issue of the sort of showing necessary to establish legally significant bloc voting—that is, the conditions that enable courts to predict that a majority bloc will consistently defeat the minority's preferred candidate." *Clements,* 999 F.2d at 858 n. 26 (internal quotations omitted); *accord Nipper* 39 F.3d at 1514 n. 43.

After examining the legislative history to Section 2's amendment in 1982, the text of Section 2 and the *Gingles* decision, the Fifth Circuit ruled that "[u]nless the tendency among minorities and whites to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, ... plaintiffs' attempt to establish legally significant white bloc voting, and thus their vote dilution claim under § 2, must fail." *Clements,* 999 F.2d at 850; *accord Houston v. Lafayette County,* 56 F.3d 606, 612 (5th Cir.1995) (" '[E]vidence that divergent voting patterns are attributable to partisan affiliation or perceived interests rather than race [is] quite probative on the question of a minority group's future success at the polls' " (quoting *Clements,* 999 F.2d at 859)); *Nipper,* 39 F.3d at 1523–24; *Armstrong v. Allain,* 893 F.Supp. 1320, 1330–32 (S.D.Miss.1994); *see Baird,* 976 F.2d at 361 ("Section 2 of the Voting Rights Act forbids the 'denial or abridgement of the right ... to vote on account of race or color'. It is a balm for racial minorities, not political ones— even though the two often coincide." (citing *Whitcomb,* 403 U.S. at 153, 91 S.Ct. at 1874)). The Fifth Circuit continued:

> [The protection of Sec. 2] extend[s] only to defeats experienced by voters 'on account of race or color.' Without an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense 'discriminatory,' and any distinction between deprivation and mere losses at the polls becomes untenable. In holding that the failure of minority-preferred candidates to

receive support from a majority of whites on a regular basis, without more, sufficed to prove legally significant racial bloc voting, the district court loosed § 2 from its racial tether and fused illegal vote dilution and political defeat.

*Clements,* 999 F.2d at 850; *see Nipper,* 39 F.3d at 1515 ("more than a mere showing of electoral losses at the polls by minority candidates is required"). Because the evidence in *Clements* established that the divergent voting patterns among white and minority voters in Texas were best explained by partisan affiliation, the plaintiffs in that case failed to establish racial bloc voting in most of the counties challenged. *Clements,* 999 F.2d at 861.

In *Nipper,* the Eleventh Circuit reached a similar but somewhat broader conclusion: "We hold that section 2 plaintiffs must demonstrate, through the [*Gingles* ] test's objective factors taken as a whole, that a voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the minority population's voting strength." 39 F.3d at 1524–25; *accord Southern Christian Leadership Conference v. Sessions,* 56 F.3d 1281, 1292 (11th Cir. 1995) (*en banc* ), *cert. denied,* —— U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996); *Vecinos De Barrio Uno,* 72 F.3d at 981. Unlike *Clements, Nipper* did not limit its holding only to the distinction between unfavorable election results caused by partisanship and those caused by racial bias. *See Clements,* 999 F.2d at 860 n. 27. Rather, any relevant non-racial causes could be raised to explain losses by minority-preferred candidates. *See Nipper,* 39 F.3d at 1524; *Sessions,* 56 F.3d at 1292; *Vecinos De Barrio Uno,* 72 F.3d at 983 n. 4; *see also Sanchez,* 861 F.Supp. at 1527 ("[I]t is permitted to undertake the additional inquiry into the reasons for, or causes of, voting behavior.").

The Court adopts the holding in *Clements* that losses by minority-preferred candidates attributable to partisan voting rather than racial bias would not constitute legally significant bloc voting under the third *Gingles* prong. The text of Section 2, the legislative history of its enactment, including

Congress' intent to retain the distinction between political losses and exclusion on the basis of race as first articulated in *Whitcomb* and *White*, the *Gingles* decision and decisions in the Fifth, Seventh and Eleventh circuits support the Court's conclusion. *But see Solomon*, 899 F.2d at 1016 n. 3 (rejecting approach similar to that taken in *Nipper* and which was propounded in concurring opinion by Tjoflat, C.J.). Defendants have raised only the issue of whether the influence of partisanship may be taken into account. The Court therefore has no reason to go beyond the scope of the Fifth Circuit's opinion in *Clements* and consider the broader questions raised in *Nipper* of whether plaintiffs must prove more generally "that a voting community is driven by racial bias" and whether non-racial factors other than partisanship may be raised to explain losses by minority-preferred candidates.[31]

The issue remaining is which party should bear the burden of proving that plaintiffs' losses are or are not attributable to partisanship. The Fifth Circuit has not taken a position on this issue. *Clements*, 999 F.2d at 860. *Nipper* addressed the allocation of proof, finding that a plaintiff could establish a prima facie case of vote dilution by showing statistical evidence of racial bloc voting. "Proof of the second and third *Gingles* factors—demonstrating racially polarized voting that enables the white majority usually to defeat the minority's preferred candidate—is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to political process. Accordingly, the existence of those factors, and a feasible remedy, generally will be sufficient to warrant relief." *Nipper*, 39 F.3d at 1524. "[T]he defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community." *Id.* at 1525; *Vecinos De Barrio Uno*, 72 F.3d at 983. This would not be a formal affirmative defense on a defendant's part, but "the practical manner in which vote dilution cases should be approached at trial." *Nipper*, 39 F.3d at 1525 n. 61. "If the defendant

offers such proof, the court must be satisfied, before ruling in favor of the plaintiff, that under the totality of the circumstances, the minority group is denied meaningful access to the political process 'on account of race.' " *Id.* at 1525; *Vecinos De Barrio Uno*, 72 F.3d at 983.

Adapting *Nipper* 's approach to the case at bar where the concern is only the manner in which partisan affiliation, rather than race, may be raised as an explanation for bloc voting, the Court will consider statistical evidence of divergent voting patterns to establish a prima facie case of legally significant racial bloc voting. Defendants may rebut this evidence with proof that partisan politics, and not race, best explain the white community's voting patterns. As in *Nipper*, this rebuttal will not be viewed as a formal affirmative defense. The burden of proving legally significant racial bloc voting remains ultimately with plaintiffs, since "[t]here is ... no textual reason to segregate some circumstances from the statutory totality, to be rendered insignificant unless the defendant pleads them by way of affirmative defense." *DeGrandy*, —— U.S. at ——, 114 S.Ct. at 2662; *see Nipper*, 39 F.3d at 1525 n. 61 (quoting same passage in *DeGrandy*, —— U.S. at ——, 114 S.Ct. at 2662). Plaintiffs merely avoid having to disprove partisanship preemptively; rather they may wait until defendants come forward with proof that partisanship accounts for disparate voting patterns. This burden allocation "strikes the appropriate balance, such that plaintiffs to make out a case of vote dilution are not required to prove the negative." *Nipper*, 39 F.3d at 1525; *see Vecinos De Barrio Uno*, 72 F.3d at 983.

Once defendants have offered proof that partisanship, rather than racial bias, underlies the differing voting patterns between whites and African–Americans, the Court must go beyond the statistical evidence and conduct a "searching practical evaluation of the past and present reality"

---

**31.** In addition to being unnecessary to the Court's ruling, any such expansion of the level of proof required to succeed in a vote dilution claim raises a host of practical and legal issues that

would have to be considered. *See Clements*, 999 F.2d at 860 (recognizing the problems involved in expanding the showing beyond partisanship).

before concluding whether the third *Gingles* precondition has or has not been met. *Clements,* 999 F.2d at 860 (internal quotations and citations omitted). This detailed analysis is necessary to ensure that a court does not summarily dismiss as political defeats vote dilution claims where partisan affiliation serves "as a proxy for illegitimate racial considerations." *Id.* at 860–61.

Accordingly, the Court first considers whether plaintiffs have established a prima facie case of racial bloc voting. Lewis's statistical analyses do reveal differences in the voting patterns of whites and African–Americans in the Town of Babylon. In the 1993 Town Board election, a majority of African–Americans supported the African–American candidate, Taylor, and her running mate, Horsley, while a majority of white voters supported the white Republican candidates. Because this Town Board election was the only one in which an African–American ran for a seat, it was the only such election that Lewis examined.

 Although analysis of prior Town Board elections would be more probative of whether racial bloc voting exists in elections for seats on this governing body, *Niagara Falls,* 65 F.3d at 1015 (citing *Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1558 (11th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988)), in the case at bar where only one African–American has run for a Town Board seat, other elections in the region, so-called exogenous elections, involving African–American candidates, may, in principle, be studied to determine whether a pattern of racial bloc voting is present, *see Niagara Falls,* 65 F.3d at 1009, 1015 (in case in which there were nine African–American–white elections for seats on the relevant governing body, court reviewed exogenous elections to confirm that "they do not cast doubt on conclusions yielded" from study of elections involving relevant governing body).

While plaintiffs' evidence with respect to exogenous elections will be considered, the Court declines to give weight to Lewis's findings for the 1988 Democratic presidential primary and the 1990 District Court judicial election. In both elections, the accuracy of Lewis's regression estimates is questionable. In his analysis of the 1990 District Court election, Lewis incredulously attributed zero votes from the African–American community to Trotter–Bellinger, the African–American candidate. With respect to the 1988 Democratic presidential primary, Lewis's estimated votes for the white candidates differed markedly from the actual votes that those candidates received. Moreover, common sense suggests that white voter support for an African–American presidential candidate with a limited chance of capturing the Democratic nomination may not be particularly probative of white support for a viable African–American candidate running for the Town Board. In any event, Jackson carried the Town of Babylon. Thus, the 1988 Democratic primary was not even an instance in which the African–American community's candidate of choice, Jackson, was blocked by white voters.

Nor is plaintiffs' analysis of the 1989 Supreme Court contest probative of the presence of racial bloc voting in the Town of Babylon. In that election, the Republican African–American candidate, Judge Floyd, was supported by both the African–American and the white community. Not only was his candidacy successful, but he received more support, in actual votes, than any of the other candidates running, including two white Republicans. Judge Floyd was, however, sitting on the District Court at the time he ran for a Supreme Court seat, already having won two District Court campaigns in 1981 and 1987. Arguably, therefore, his election involved special circumstances in that it could be attributed to his incumbency status. The presence of "special circumstances," such as "the absence of an opponent, incumbency or the utilization of bullet voting," should be considered in assessing the significance of a minority victory. *Gingles,* 478 U.S. at 57 and n. 26, 77 and n. 38, 106 S.Ct. at 2770 and n. 26, 2780 and n. 38 (declining to give an exclusive list of such circumstances).

The only remaining elections that Lewis analyzed are the 1989 and 1991 District Court contests. In the 1989 District Court election, involving two seats, African–Americans predominantly supported the African–

American Democratic candidate, Trotter–Bellinger, while the white community gave substantial support to the two white Republicans, both of whom received nearly double the votes cast by whites for Trotter–Bellinger. In the 1991 District Court election, an estimated 100% of African–American voters supported Trotter–Bellinger while white voters gave majority support to the white Republican candidate. Thus, both these cases are instances of racial bloc voting in that the African–American candidate of choice was defeated by white support for the Republican candidate(s). Interestingly, however, Trotter–Bellinger nearly received sufficient votes from the white community in the 1991 District Court election to be elected. Lewis and Stanley had testified that a candidate supported by 100% of the African–American community needed between 43% to 45% of the white vote for election. Trotter–Bellinger received approximately 41% of the white vote.

The Court questions whether it could find that plaintiffs have established a prima facie case of racial bloc voting on the basis of evidence that in three elections, the 1993 Town Board and the 1989 and 1991 District Court races, African–American and white voters supported different candidates. Such a finding is made problematic by testimony that judicial campaigns tend to be more limited in scope than ordinary political campaigns, making judicial elections uncertain guideposts as to voting patterns in Town Board elections. *Cf. Sessions,* 56 F.3d at 1293 (implying that while comparisons between legislative and judicial elections are relevant to the inquiry, significant differences between the legislative and judicial arenas should not be glossed over).

Moreover, Lewis did not examine a number of exogenous elections involving the Town of Babylon's electorate in which African–Americans were candidates. Lewis admitted at trial that at least eleven elections involving minority candidates took place in Babylon in the period from 1983 to 1993. Although the Court recognizes that plaintiffs may have had difficulty in obtaining election data from the Town, without any testimony as to the universe of elections involving the

Town's electorate and African–American candidates, the Court would only be able to assume that the elections that Lewis considered were ones in which white voter response to the African–American candidates was typical.

▐ Since Town Board elections involving only white candidates may also be examined to determine whether whites and African–Americans in Babylon tend to vote for different candidates, resolution of whether plaintiffs have set forth a prima facie case of bloc voting based only on Lewis's analysis of the three elections involving African–American candidates is unnecessary. Whether out of principle or strategy, plaintiffs argued that Town Board elections involving only white candidates were not relevant to the question of racial bloc voting. Essentially, plaintiffs claimed that the race of the candidate was as critical to the racial bloc voting analysis as the race of the voter.

The Second Circuit has rejected this argument. *See Niagara Falls,* 65 F.3d at 1016–17. Noting that the Voting Rights Act "does not explicitly address the question of how much weight, if any, courts should afford white-white elections," *id.* at 1015, the Second Circuit refused "to adopt an approach precluding the possibility that a white candidate can be the actual and legitimate choice of minority voters," *id.* at 1016. "Such an approach would project a bleak, if not hopeless, view of our society—a view inconsistent with our people's aspirations for a multiracial and integrated constitutional democracy." *Id.* Expressing concern that assessing whether a candidate was minority-supported would "require district judges to assess candidates' authenticity in matters racial—an unavoidably malleable, highly subjective inquiry," *id.* at 1018–19, the Second Circuit articulated a bright-line rule for determining whether a white candidate may be minority-preferred:

> [A] candidate cannot be 'minority-preferred' if that candidate receives support from fewer than 50% of minority voters. When a candidate receives support from more than 50% of minority voters in a general election, a court need not treat the candidate as minority-preferred when an-

other candidate receiving greater support in the primary failed to reach the general election. Finally, even if a candidate receives more than 50% of the minority vote, a court need not treat the candidate as minority-preferred if another candidate receives significantly higher support. This approach arguably may create results over- or underinclusive at the margin. But we think that the ballot box provides the best and most objective proxy for determining who constitutes a representative of choice.

*Id.* at 1019; *see also Collins,* 883 F.2d at 1237 (noting that simply treating as the minority preferred candidate a successful candidate receiving more than 50% of the minority vote is inappropriate where minority gave greater support to another candidate who was defeated).

Applying this bright-line rule, a majority of African–American voters supported the white Democratic candidates in each of the Town Board elections in the period from 1983 to 1991. White voters supported the white Republican candidates in six of these ten elections in sufficient numbers so as to block the African–American candidates from succeeding.

■ The 1987 and 1991 victories by the African–American-supported white Democratic contenders for the Town Board do not undermine a finding that African–American and white voters generally vote differently in Town Board contests. Special circumstances may have controlled in both of these elections. In the 1987 Town Board contest, a well-financed campaign by a private citizen unhappy with a Board decision and the popularity of the Democratic candidate for County Executive in that year resulted in sufficient cross-over voting to allow the Democrats to win. The 1991 success of the two African–American-supported Democratic contenders may be attributed at least in part to their incumbency status. Moreover, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that a district experiences bloc voting. *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2770.

More problematic for plaintiffs are the exogenous elections for Town Supervisor in the period between 1983 to 1993. These elections signify that any white bloc voting in Town Board elections does not carry into most of the Town Supervisor contests. During this period, four Town Supervisors supported by a majority of African–American voters were elected. Only in two contests, in 1983 and 1985, was the candidate of choice of a majority of African–American voters defeated. The unusual nature of the 1987 contest may, however, in large part also explain the Democratic candidate's election as Town Supervisor, and his incumbency status may have be an important element in his subsequent victories in 1989 and 1991. Schaffer likewise was an incumbent in the 1993 Town Supervisor campaign, having won a previous special election for the position.

Plaintiffs presented no evidence that the African–American community was united behind a different candidate in primaries or caucuses for the elections studied. *Cf. Niagara Falls,* 65 F.3d at 1018 ("[S]uccess of a minority-preferred candidate in a general election is entitled to less weight when a candidate with far greater support was defeated in the primary. . . ."). Competition for the Democratic candidacy in Town Board or Town Supervisor election may in fact have been minimal given Bachety's testimony that in her role as a member of the Town's Democratic leadership, "we used to beg people to run for office." (Tr. at 662.)

■ Thus, it is questionable whether plaintiffs have established a prima facie case of racial bloc voting. Assuming, *arguendo,* that plaintiffs have set forth a prima facie case, the Court must still consider whether plaintiffs have overcome defendants' proof that divergent voting patterns in the Town of Babylon are best explained by partisan affiliation than racial bias. The Court concludes that plaintiffs have not adequately rebutted defendants' evidence.

Stanley's statistical analyses and lay testimony reveal that African–American voters in Babylon are overwhelmingly Democrats while a plurality of white voters are Republicans. The remainder of the white community splits its vote 60% to 40% be-

tween Republican and Democratic candidates, respectively. Thus, there is incongruity in the party affiliation of the Town's whites and African–Americans. Moreover, Suffolk County, of which Babylon is a part, is Republican-dominated.

A review of Town Board elections from 1983 to 1993 indicates that not only do African–Americans and a majority of white voters in the Town of Babylon tend to be affiliated with different political parties but that this differing party affiliation is an explanation for the divergent voting patterns between whites and African–Americans in Town Board elections. In these elections, Democrats consistently lost while Republicans won. At least a majority of African–American voters supported the Democratic nominee in every Town Board election since at least 1983. No Democratic nominee, whether white or African–American, for a Board position during that period received majority white support. In only one election, the 1987 Town Board contest, did the Democratic nominees receive more white votes than the Republican nominees.

Democrats won Town Board seats only where special circumstances prevailed, such as the presence of a popular and high profile candidate on the same party ticket or incumbency. *See Clements,* 999 F.2d at 882 (noting positive effect of popularity of Democratic candidate in high profile race on races "marked more by anonymity than name identity"). Even with the advantage of incumbency, the white Democratic candidates in the 1991 election actually lost in the white community and won by virtue of support from the African–American community.

Bachety's testimony confirms that partisanship influences the voting patterns of the Town's electorate. Bachety noted that unless a Town Board candidate waged a high profile campaign or was a well-known figure in the community, Town Board elections tended to attract little interest from the electorate. With minimal familiarity with the specific candidates, the electorate was more likely to vote along party lines.

Bachety contrasted the low-profile nature of Town Board elections with the more visible Town Supervisor contests. Because Town Supervisor contests attracted greater attention from the electorate, white voters were more likely to deviate from straight partisan voting. This would explain the greater success of minority-preferred Democratic candidates for Town Supervisor over those running for the Town Board during the period from 1983 to 1993. Even given the more visible nature of Town Supervisor contests, only in the 1993 election did the Democratic candidate for Town Supervisor, Schaffer, obtain a majority of the white vote.[32]

This evidence that the Town's voting patterns may be attributed to partisanship is not alone sufficient to defeats plaintiffs' efforts to satisfy the third *Gingles* precondition. The Court must also assure itself that the Town's political parties do not serve as proxies for race. *See id.,* 999 F.2d at 860.

The one Town Board election in which an African–American vied for office supports that partisanship, rather than race, best elucidates voting patterns in Town Board elections. White voter support for Taylor did not differ markedly from that for her white Democratic running mate, Horsley. Moreover, white voter support for Taylor was well in line with the support white voters gave to a majority of the white Democrats running for the Town Board in the period from 1983 to 1993. It would strain credulity to suggest that the unsuccessful white Democrats from 1983 to 1993 lost because they were Democrats, but Taylor, who received equal or greater white support than a majority of these candidates, lost because she was African–American.

Losses by the minority-preferred candidate in the 1989 and 1991 District Court contests likewise point to partisanship, rather than race, as the explanation for divergent voting patterns among whites and African–

---

**32.** Defendants' expert Stanley also testified that, based on regression analysis, variations in the vote received by candidates across election districts was tied more to a district's partisan, than to its racial, composition. Since Stanley failed to provide the Court with documentation supporting this statistical finding or to specify the elections that he studied, the Court declines to give Stanley's conclusion any significant weight.

Americans in the Town of Babylon. In these contests, the Democratic and minority-preferred candidate, Trotter–Bellinger, who had been appointed to serve out a term on the District Court, failed to obtain a cross-endorsement from the Republican or Conservative parties. Schaffer testified that at least through the 1993 election, no Democratic candidate for a judgeship, whether a sitting incumbent or not, had been successful unless he or she had received a cross-endorsement from the Republican or Conservative parties. These losses in the absence of cross-endorsements appear to be related to the low-profile nature of judicial elections which tended to lead to voting along party lines. Without some indication that Trotter–Bellinger fared worse in the 1989 and 1991 District Court contests than Democrats in earlier or later judicial contests running without cross-endorsements, the Court is loath to conclude that race, rather than partisanship, influenced her electoral losses.

Moreover, in the 1989 District Court election in which more than one seat was open for contest, Trotter–Bellinger received nearly as much support from white voters as her white Democratic running mate. It would be contradictory to suggest that Trotter–Bellinger lost for racial reasons but her white Democratic counterpart lost for partisan reasons.

Judge Floyd, the one African–American candidate in the elections analyzed who ran as a Republican, received virtually the same support in white elections districts as his white Republican running mates in the 1989 Supreme Court race. He was elected with substantial support from the white and African–American communities. Moreover, Judge Floyd had twice previously won election to the District Court running at-large in Babylon. Since the Town's African–American population would not have been large enough to assure Judge Floyd's election in those district court contests, Judge Floyd must have also been supported by a substantial portion of the white community in those elections. That the only known African–American running on the Republican ticket could be elected three times reinforces the conclusion that the voting patterns of whites in Babylon are not attributable to race but to partisanship.[33]

Thus, white voters supported minority candidates slated by a political party at levels at least equal to the support enjoyed by the white candidates of that party, even where the minority candidate was opposed by a white candidate from the other party. It would be difficult to conclude on this record that any partisanship reflected in the Town's elections serves as a proxy for race. *See Gingles,* 478 U.S. at 100, 106 S.Ct. at 2792; *Whitcomb,* 403 U.S. at 149, 91 S.Ct. at 1872; *Clements,* 999 F.2d at 861 (in deciding that political parties were not proxies for race, court noted that "the undisputed evidence discloses that white voters in most counties, both Republican and Democratic, without fail supported the minority candidates slated by their parties at levels equal to or greater than those enjoyed by white candidates, even where the minority candidate was opposed by a white candidate").

Moreover, there was minimal evidence that race defined the voting patterns of either whites or African–Americans in primary contests or in nominating processes where partisanship would not have been an issue. Named plaintiff Reed testified, without indicating the basis of his knowledge, that Judge Floyd, the successful African–American candidate for a Supreme Court seat in 1989, "had been denied a promotion for many, many years and wherein all the rest of them after they served two years on the district level, whatever, they got a higher level." The Court cannot be expected to hypothesize, without more information, as to the reasons for any delay in promoting Judge Floyd. Named plaintiff Burnett commented on his inability to fund raise within Suffolk County's white Democratic community dur-

**33.** By contrast, the considerable African–American support that Judge Floyd received does show that race rather than partisanship may have been an element influencing the African–American vote in this election. Lay testimony indicated that in other contests, the African–American community had supported white Democrats over African–American Republicans. In any event, the Court's focus is principally on the extent to which the white community votes on the basis of partisanship or race.

ing a 1985 Suffolk County legislative contest. No other evidence was offered showing that African–Americans candidates were not supported at the nomination or primary level by the white members of the Town's Democratic and Republican parties. To the contrary, Schaffer testified that white Democratic party members supported African–American over white candidates and vice versa in local Democratic primaries. Schaffer specifically cited the 1983, 1985 (Burnett against white candidate Peter Monaco) and 1987 (Schaffer against David Harvey, an African–American) county legislative contests as instances where white Democrats at least in part backed the African–American candidates and African–Americans at least in part supported the white candidates.[34]

An additional factor, cited as relevant by the Supreme Court in *Whitcomb*, 403 U.S. at 153, 91 S.Ct. at 1874, confirms that the Town's political parties are not proxies for race. This factor concerns the level of involvement of white voters in the minority-preferred political party. White voters in the Town of Babylon constitute a majority of both its Democratic and Republican parties. Moreover, between 27.6% to 43.3% of white voters voted for Democratic candidates in Town Board elections from 1987 to 1993, representing a majority of Democratic voters in those contests.[35] "The suggestion that Republican voters are galvanized by a 'white' or 'anti-minority' agenda is plausible only to the extent that the Democratic Party can be viewed as a vehicle for advancing distinctively minority interests...." *Clements*, 999 F.2d at 860. This cannot be the case where a majority of the party's membership and voting base is white. Moreover, although the Democratic party in Babylon has advanced African–American interests, no evidence was adduced that the party has done so exclusively or disproportionately.

White members of the Democratic party have therefore obviously experienced the same electoral defeats as the party's minority

voters. Allowing the African–American electorate to succeed on its racial vote dilution claim under these circumstances would leave the Court hard-pressed to "justify withholding similar relief from white Democrats." *Id.* at 861 (citing *Whitcomb*, 403 U.S. at 153, 91 S.Ct. at 1874).

The Court concludes that plaintiffs have failed to establish legally significant racial bloc voting and thus have not satisfied the third *Gingles* precondition. Even assuming that plaintiffs have proffered a prima facie case of bloc voting, divergent voting patterns among white and African–American voters are best explained by partisan affiliation rather than race. Because plaintiffs have not established two of the three *Gingles* preconditions, they are not entitled to relief under Section 2. Nevertheless, the Court will, for the sake of judicial economy, proceed to examine the totality of the circumstances in the Town of Babylon to determine whether, had plaintiffs met the three preconditions, they could have shown that relief under Section 2 would have been warranted under the totality of the circumstances.

### E. *The Totality of the Circumstances*

◼ The purpose of examining the totality of the circumstances in the Town of Babylon is to determine whether the Town's African–American electorate has a diminished opportunity to participate in the political process and to elect the candidate of their choice. "The requirement of this broader inquiry follows from the Act itself, which states that a violation of the Act 'is established if, based on the totality of circumstances, it is shown' that the political process is not equally open to participation." *See Niagara Falls*, 65 F.3d at 1019–20 (quoting 42 U.S.C. § 1973(b)). In deciding whether such a finding would be warranted, the Court turns to the factors listed in the Senate Report. In doing so, the Court recognizes that these factors are not exclusive determi-

---

**34.** For reasons noted previously, the Court, in concluding that race did not define voting patterns in primaries, has accorded very little weight to the bloc voting present in the 1988 Democratic presidential primary between white and African–American Democratic voters.

**35.** The Court could not calculate a comparison for the 1983 and 1985 Town Board elections because Stanley's statistics for those elections were based on 1980 Census total population figures which were not provided to the Court.

nants of the totality of the circumstances in Babylon and that the Court may consider such other evidence as it may deem relevant. *See DeGrandy*, —— U.S. at ——, 114 S.Ct. at 2657.

### 1. *History of Official Discrimination*

The first Senate Report factor concerns whether a history of official discrimination exists in the Town of Babylon affecting the right of its African–American populace to register, to vote or otherwise to participate in the political process. Plaintiffs proffered the lay testimony of its named plaintiffs to prove the existence of a history of official discrimination. Dr. Abigail Thernstrom, adjunct professor at Boston University and Senior Fellow at the Manhattan Institute in New York City, testified as a defense expert on this issue.[36]

 Although the existence of general racial discrimination as part of United States country's history would be subject to judicial notice, this would not be enough to meet the first Senate Report factor. Courts have still examined the specific history of official discrimination in the jurisdiction challenged.[37] A plaintiff must therefore establish that the particular jurisdiction challenged has a history of officially restricting, directly or indirectly, African–American access to the political process.

In this case, plaintiffs allege, without citing a source, a number of acts of official discrimination by New York State and its counties. In 1821, the New York State constitution provided a longer residency rule for African–American males than for white males and imposed a greater property ownership requirement. In 1828, New York State's constitution was amended to eliminate the property ownership requisite for white, but not for African–American, males. In 1921, New York required prospective voters to pass an English literacy test. In 1971, three New York counties, Kings, New York and Bronx, became covered under Section 5 of the Act. Presumably under the purview of Section 5 of the Act, the United States Department of Justice objected nine times to districting plans submitted by both New York County and New York State on grounds of discriminatory practices and procedures.

The constitutions of 1821 and 1828, however, really are "history." *Cf. Magnolia Bar Ass'n*, 793 F.Supp. at 1408 (noting that history of official discrimination in Mississippi affecting the right to vote was remote). Literacy tests are not *per se* unconstitutional. *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 52–4, 79 S.Ct. 985, 990–91, 3 L.Ed.2d 1072 (1959). Plaintiffs have not cited any evidence that New York's literacy test was unconstitutionally broad or that New York or the Town of Babylon applied the literacy test so as to discriminate against minorities. *See Lassiter*, 360 U.S. at 53, 79 S.Ct. at 991. Section 5 coverage of three New York counties was triggered pursuant to a formula relating to turnout in the 1968 presidential election and not to a finding of a history of discrimination.[38] Moreover, what-

---

**36.** Thernstrom's educational background includes a Ph.D. from the Department of Government of Harvard University. She has authored one major work on voting rights, *see* Abigail M. Thernstrom, Whose Votes Count? Affirmative Action and Minority Voting Rights (Harvard University Press 1987), and is presently co-authoring a book on race in America. She has written numerous articles on public policies relating to race and ethnicity. She served one time previously as an expert in a voting rights case.

**37.** For examples of the kind of history reported in voting rights cases covered by Section 5 of the Act *see Miller*, —— U.S. at ——, 115 S.Ct. at 2501 (Ginsburg, J., dissenting) (Georgia) and *Sessions*, 56 F.3d at 1318–1323 (Alabama).

**38.** According to Thernstrom, the original coverage formula, carefully designed to cover the South, made Section 5 applicable to any state or part of a state which maintained a "test or device" in 1964 and which had either a voter registration or a voter turnout in the 1964 presidential election of less than fifty percent of the voting age population. 42 U.S.C. § 1973b(b). In 1970, this provision of Section 5 was extended for five years and reformulated so as to cover jurisdictions who maintained a test or device in 1968 and whose registration or turnout dropped below 50% in the 1968 presidential election. Thernstrom testified that she found no indication that the New York counties were targets of the 1970 amendments. In fact, Dr. Thernstrom hypothesized that the extension of Section 5 coverage to these New York counties may have simply resulted from lack of voter interest in the 1968 presidential election.

ever implications flow from Section 5 coverage over these counties, and from objections interposed by the U.S. Justice Department to changes to voting practices therein, these implications cannot be extended automatically to the Town of Babylon which is located in a county that does not appear to have been covered by Section 5 of the Act.

In contrast to this questionable evidence of past official discrimination, Thernstrom writes:

> Nothing in the history of New York even remotely approaches the systematic exclusion of blacks from the political process that existed in the South. On the contrary, the state of New York has long been in the vanguard of the struggle for African American civil rights. Indeed, it can boast the most liberal record of any state in the union on that count. As early as 1874, New York outlawed racial discrimination in public places; it was only the second state in the union to do so. In 1913 it became the first state in the nation to ban the discriminatory advertising of public facilities and accommodations, and its example inspired ten others to follow shortly after. New York also led the nation in legislation barring employment discrimination, with a series of statutes beginning in 1909. The climax of this drive came with the passage of the Ives–Quinn Bill in 1945, a key turning point in the history of civil rights legislation in the United States. [The bill created] the first permanent state agency in the country to be charged with the duty of rooting out discriminatory employment practices. In 1948 New York similarly outlawed all forms of racial discrimination in the field of education as well.

(*Thernstrom Report,* Def.Exh.R., at 11 (citing Nathan Glazer and Reed Ueda, "Policy Against Prejudice and Discrimination," in *Harvard Encyclopedia of American* Ethnic Groups 852–854 (Stephan Thernstrom, ed., Harvard University Press, 1980)).)

The Court cannot infer that Babylon's history is unlike that of New York State generally. Registration and voting procedures for African–Americans have been the same as those for the remainder of the Town's electorate. Plaintiffs proffered scant evidence as to African–Americans in Babylon experiencing difficulty in registering to vote, in voting, running for office or joining and participating in a political party. The little that was adduced consisted of Reed's hearsay testimony and an unauthenticated letter from a U.S. Attorney's office regarding door-to-door police verification in 1979 of new African–American registered voters. Even if this evidence is credited, plaintiffs never attempted to show that the verification procedure, and any subsequent invalidation of registrations, was uncommon or only affected African–Americans registrants. Reed also implied a purposeful attempt to dilute the African–American community's voting strength when he testified as to a redistricting after the 1979 legislative campaign which resulted in North Amityville and Wyandanch being incorporated into two separate districts. Plaintiffs offered nothing, however, to support this interpretation of legislative intent.

The Court is unable to conclude based on this weak evidence that a history of official discrimination is present in Babylon affecting the African–American community's ability to participate in the political process.

### 2. *Racial Polarization in Elections*

This Senate Report factor is discussed in detail above. Even if a majority of white voters vote so as usually to defeat the minority community's candidate of choice, this divergent voting pattern is driven, at least in the white community, by partisanship, not race.

### 3. *Existence of Practices or Procedures Enhancing Opportunity for Discrimination*

Babylon's Town Board elections do not require a majority vote for election, and there is no anti-single shot voting provision. The Town does have staggered elections, with two members of the Town Board selected every two years. Staggered elections may be a problematic election practice. *See Niagara Falls,* 65 F.3d at 1020; *Harvell,* 71 F.3d at 1390. The Second Circuit has implied, however, that in order for staggered elections to affect negatively the totality of the circumstances inquiry, a minority group must demonstrate the dilutive effect of the

practice on their voting strength. *Niagara Falls*, 65 F.3d at 1020.

In the case at bar, plaintiffs have not even alleged that the Town's staggered election structure is problematic, much less supported such a claim. In any event, as the Second Circuit has emphasized in describing the totality of the circumstances inquiry, " 'there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other.'" *Id.* (citing *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763).

### 4. *Exclusion from Slating Process*

█ Plaintiffs adduced no evidence suggesting the existence of a slating group from which the Town's African–Americans were excluded. "The term 'slating' is generally used to refer to a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." *Westwego Citizens*, 946 F.2d at 1116 n. 5 (citation omitted). Assuming that the Democratic party's screening committee is a slating group for determining the Democratic candidate that will compete in a general election, there was minimal proof that African–American candidates had trouble getting past that committee. Plaintiff lay witness Leonard F. Canton, a Democratic committeeperson, testified that "usually we couldn't get [African–American candidates] past the screening process" but did not give any specific examples. (Tr. at 642.) Bachety was unaware of any instance where an African–American had "a difficult time getting passed [sic] the screening committee." (Tr. at 662.) Indeed, named plaintiff Burnett is the current chairperson of the screening committee. Nothing, other than Reed's vague testimony regarding the delayed promotion of Judge Floyd to the Supreme Court, points to different circumstances in the Republican party.

### 5. *Effects of Discrimination on African–American Socioeconomic Status and Impact on African–American Ability to Participate Effectively in Political Process*

█ The fifth Senate Report factor requires a showing that, as a result of past discrimination, African–Americans in Babylon suffer from lower socioeconomic conditions than whites and that African–American political participation is depressed. *See Gingles*, 478 U.S. at 69, 106 S.Ct. at 2776; *Clements*, 999 F.2d at 866–67. No casual nexus between lower socioeconomic status and lower political participation need be proven. *See Niagara Falls*, 65 F.3d at 1021 (citing S.Rep. at 29 n. 114, 1982 U.S.C.C.A.N. at 207); *Clements*, 999 F.2d at 867.

Except for limited testimony, unsupported by statistics, regarding higher crime rates in Wyandanch and North Amityville, the record is bereft of any evidence of the African–American community's socioeconomic status. *Cf. Westwego Citizens*, 946 F.2d at 1115, 1122 (citing statistics of socioeconomic status of minority). Plaintiffs neglected even to offer into evidence 1990 Census housing, employment, income, education and other relevant statistics. *Cf. North East Indep. School Dist.*, 903 F.Supp. at 1085–86 (where these statistics were offered into evidence); *Sanchez*, 861 F.Supp. at 1529 (same).

Plaintiffs did attempt to show that the African–American populace suffers from a disproportionate share of the Town's undesirable facilities but that evidence is inconclusive of lower socioeconomic status connected to past discrimination. First, it is unclear whether many of the facilities that plaintiffs referred to exclusively affect the African–American populace. Second, the white communities bear a share of the Town's undesirable facilities, including the Town's sewer and high voltage electrical units. Third, no evidence whatsoever was introduced as to any higher incidence of health problems in the African–American community. Fourth, the presence of any undesirable facilities near African–American populations would not, without more, imply that these facilities were purposely located near African–American residences or that African–Americans were forced to move near the facilities.

Plaintiffs offered other evidence of past discrimination. Reed noted the Town's plan in the 1950's to build two same grade schools

which would have resulted in *de facto* segregation of white and African–American students. Reed also testified as to one instance where an unidentified African–American in the 1950s was unable to build a home in Copiague because "every time he would get a little construction built, somewhere someone would come and set fire to it." (Tr. at 14.) Reed emphasized that African–Americans had difficulty finding employment through the early 1960s. Moreover, until the late 1960's, the Town's fire department had a "no blacks need apply" rule, (Tr. at 21), although it was unclear whether this was an official policy. *Cf. Westwego Citizens*, 946 F.2d at 1116 (fire department had, until 1981, by-laws restricting membership to whites). According to Reed and Burnett, problems existed within the police department as well, with African–American police officers bringing discrimination claims against the Suffolk County Police Department, including at least one class action suit.

Even assuming that this very general testimony suffices to establish past discrimination in the areas of employment, housing and education, plaintiffs have not proved that the African–Americans continue to suffer in these categories. The Town never implemented its 1950's plan and does not appear to have made any other efforts to segregate students by race. One example from approximately 40 years ago of an African–American having difficulty building a home in a white neighborhood cannot support that African–American residents suffer discrimination in housing. The outcome, much less the number, of any discrimination suits brought against the Suffolk County Police Department was never specified. The fact that only 52 out of 2,702 Suffolk County police officers and no firefighters in the Wyandanch fire station are currently African–American does indicate that African–Americans are under-represented in these sectors. More data would be needed, however, before the Court would be willing to infer that African–Americans generally have fewer opportunities in the current job market.

Plaintiffs' failure to prove that they endure disadvantages in the areas of housing, income, employment, health safety and education arising from past discrimination is in and of itself a sufficient basis to rule against them with respect to the fifth Senate Report factor. The Court will, however, proceed to consider the second prong of this Senate Report factor, namely, whether the Town's African–American population is hindered in its ability to participate in the political process. African–Americans constitute 13.3% of the Town's voting age population and 12.8% of its registered voters in 1993, hardly suggesting that their current participation in the Town's political process is depressed.

Based on the Court's own calculations, the percentage of African–Americans turning out to vote has, however, been consistently lower, ranging between 4.6% and 6.7% of total voters at the polls in the Town Board, District Court and Supreme Court elections between 1987 and 1991 that the parties' experts studied. Only in the 1993 Town Board election, in which the African–American candidate Taylor competed, did African–American voter turnout reach as high as 10.7% of all voters.

The lower voter turnout of the Town's African–Americans may be explained at least in part by the differences in age structure of the two populations. The African–American voting age population tends to be younger in age, and, according to both parties, young adults tend to participate in the political process at lower rates than older adults, regardless of race. Burnett asserts, however, that, based on his conversations with voters, the gap is also due to African–American frustration that "my vote doesn't count" (Tr. at 444) since "we've been unsuccessful thus far in electing an African American candidate" (Tr. at 446).

Despite their lower voter turnout, other evidence indicates that African–Americans actively participate in the political process. *See Niagara Falls*, 65 F.3d at 1021 (where even though African–American voter turnout rates were also low in that case, other evidence indicated "active political participation on the part of" African–Americans in the

community). African–Americans have been elected to serve as county committeepersons [39] and in other positions of leadership in the Town's Democratic and Republican parties. *See Sanchez,* 861 F.Supp. at 1529–30 (considering minority participation in political parties in assessing fifth Senate Report factor). Burnett is currently co-chairperson of the Town's Democratic party. African–Americans competed in at least eleven elections involving the Town of Babylon between 1983–1993. African–Americans have been appointed to key positions in the municipal government and to serve on local boards and commissions in numbers proportionate to their population in the Town. *See id.* at 1530 (considering minority appointments to local government in assessing fifth Senate Report factor). Whether the Democratic party may have an informal policy of discouraging African–American candidates from campaigning in Babylon's white regions was not established. African–Americans have conducted successful campaigns to improve voter registration and turnout, as evidenced in the 1993 Town Board election where African–American voter registration was only .54% lower than the African–American voting age population and African–American voter turnout reached a highwater mark. *See id.* (considering minority voter registration and turnout in assessing fifth Senate Report factor).

Burnett himself noted that the African–American community was politically active. He cited the African–American Democratic clubs in North Amityville and Wyandanch as examples. Moreover, he noted that in the fifteenth legislative district encompassing Wyandanch, African–Americans register to vote at a rate 5% higher than the white population in the district.

Based on the considerable political involvement of the African–American community, the Court cannot conclude that African–American political participation is depressed. Accordingly, plaintiffs have failed to prove both aspects of the fifth Senate Report factor.

### 6. Whether Political Campaigns Are Characterized by Overt or Subtle Racial Appeals

There was testimony regarding racial appeals in campaign literature circulated in a 1984 school board election involving a portion of Babylon's electorate and in a 1979 county legislative contest involving a district within Babylon. The African–American candidates that were the targets of these racial appeals lost. While deplorable, these racial appeals occurred ten years ago, and plaintiffs presented no evidence as to more recent racial appeals. Moreover, no clear indication was provided as to the degree that the campaign literature containing the racial appeals was circulated or as to who, whether supporters of a major party or a fringe candidate, distributed the literature. Nor was the Court provided with copies of the campaign literature cited as racist. The Court therefore declines to give significant weight to these alleged instances of racist appeals.

Moreover, plaintiffs have not proved that the establishment of separate polling places in Amityville in the 1984 School Board election constituted a subtle racial appeal. In order for the Court to have drawn this inference, the record should have contained more than Taylor's conjecture as to the reason for the separate polling places.

There was no evidence of racial appeals to the electorate in any Town Board election contest. As noted above, the response that Taylor received from white voters was in line with that received by other white Democratic candidates.

### 7. The Extent to Which African–Americans Have Been Elected to Public Office in Babylon

Although "[t]he extent to which minority group members have been elected to public office in the jurisdiction" is one of the most important Senate Report factors, together with racial polarization, *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15; *see Niagara Falls,* 65 F.3d at 1022 (citations omitted), the record in this case does not permit proper

---

**39.** A committeeperson is elected to represent the party's membership in an election district. The position is unpaid and is the "lowest" on "the totem pole." (Tr. at 640.)

evaluation of this Senate Report factor. It is clear that no African–American has ever served on the Town Board or as Town Supervisor. Plaintiffs, however, never gave the Court any indication of the total number of other African–American officials elected by all or a portion of the Town of Babylon's electorate. There was no evidence even on the number of African–Americans who have been elected to school boards or as committeepersons. *See Niagara Falls,* 65 F.3d at 1021 (noting, in finding this Senate Report factor not proven, that African–Americans had been elected to positions on board of education). Nor was there specific evidence as to the total number of African–Americans elected in primary contests involving the Town's electorate. *See id.* at 1022 (reviewing African–American successes in primary contests in considering this Senate Report factor).

Even based on plaintiffs' incomplete evidence, at least three African–Americans have been chosen to run for, or been elected to, public office by all or a portion of the Babylon electorate since 1979. Reed won the primary race for a Suffolk County legislative seat in 1979. Judge Floyd won two elections to serve on the District Court and one election to serve on the Supreme Court. The one African–American, Taylor, who ran for the Town Board was part of the Democratic ticket. The Democratic party actively recruited her to run, supported her candidacy and included her in campaign events taking place throughout the Town.

The probative value of the limited number of African–American officials must be considered in light of the percentage of African–Americans in the electorate. The Court is instructed to evaluate the totality of the circumstances with a " 'functional' view of the political process." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2764. Such a functional analysis of the electoral process must recognize that the limited number of African–American elected officials would be more probative where African–Americans were 40% of the population rather than 14.93%. *Cf. Clements,* 999 F.2d at 865 (noting that "[t]he absence of eligible candidates goes a long way in explaining the absence of minority

judges"). Political scientists would not expect to see many Republicans in office if only 15% of the electorate had registered with that party. Likewise, it should not be surprising that few African–Americans have been elected in a Town in which they are only 14.93% of its population and are overwhelmingly identified with the Town's minority party.

### 8. Response of Town Board to the Interests of the African–American Electorate

The Senate Report relegated evidence of governmental responsiveness to minority needs to a minor role. *See* S.Rep. at 29, 1982 U.S.C.C.A.N. at 207. Moreover, the Second Circuit has "pursue[d] this inquiry with some reluctance, as it entails our deciphering what policy steps qualify as responses to the 'needs of members of the minority community.' " *Niagara Falls,* 65 F.3d at 1023 n. 24. Noting, however, that *Gingles,* and the Senate Report mandate this undertaking, the Second Circuit has defined the responsiveness inquiry to be a "review of tangible efforts of elected officials and the impact of these efforts on particular members of the community." *Id.*

Evidence of the present Town Board's responsiveness was overwhelming. African–Americans have important and influential positions of power within the municipal government, in the Democratic party and on local boards. The number of seats that African–Americans hold on local boards is in proportion to their population in the Town. African–American leaders such as Burnett have had input in the selection of African–Americans to serve in these positions.

Community development funds have been increasingly directed to the minority community. The Town is making strides in improving policing in the predominantly African–American regions. *See id.* at 1023 (noting relevance of government' efforts to improve policing in minority community).

The Town Board's attentiveness to minority concerns is not surprising given that the two Democratic members elected in 1991 owe their election to the African–American vote. Moreover, the success of the minority pre-

ferred candidate for Town Supervisor has given the African–American community, constituting 13.34% of the Town's voting age population, control over 20% of the voting power on the Town Board in eight of the twelve years from 1983 to 1995.

### 9. Whether Policy for Maintaining Multimember District is Tenuous

Plaintiffs implied that the policy underlying the Town's maintenance of the multimember district system for electing the Town Board is tenuous. Plaintiffs insinuated that the only impediment to adoption of single member districts was the unwillingness of the Town's Democratic leadership to implement the change. Defendants correctly responded that they could not adopt single member districts without a Town referendum, an option which defendants claim that plaintiffs rejected. Defendants' refusal to adopt single-member districts in a manner which would have exceeded the Town Board's authority may hardly be termed tenuous.

### 10. Conclusion Based on the Totality of the Circumstances

After examining the record as a whole, the Court concludes that the African–Americans in the Town of Babylon have an opportunity equal to other members of the electorate to participate in the political process and to elect representatives of their choice.

## II. Constitutional Claims

Plaintiffs have also alleged, without any legal analysis whatsoever, that the at-large system for electing the Town Board violates the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution.

It is unclear whether the Fifteenth Amendment applies to vote dilution claims and, if so, to what extent. See Shaw, 509 U.S. at ———–———, 113 S.Ct. at 2822–2824 (discussing application of Fifteenth Amendment to racial gerrymandering, but ultimately deciding on Fourteenth Amendment grounds); Voinovich, 507 U.S. at 158–60, 113 S.Ct. at 1158 ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment." (citation omitted)). Assuming that the Fifteenth Amendment speaks to plaintiffs' claim of vote dilution, the Court will subsume its determination of this claim in the analysis required under the Fourteenth Amendment. See North East Indep. School Dist., 903 F.Supp. at 1093; Clay v. Board of Educ. of City of St. Louis, 896 F.Supp. 929, 944 (E.D.Mo.1995); Turner v. Arkansas, 784 F.Supp. 553, 578–79 (E.D.Ark.1991) (three-judge court), aff'd mem., 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992).

"A determination of discriminatory intent is a requisite to a finding of unconstitutional vote dilution" under the Fourteenth and Fifteenth Amendments. Rogers v. Lodge, 458 U.S. 613, 621, 102 S.Ct. 3272, 3277–78, 73 L.Ed.2d 1012 (1982) (citation omitted); see Shaw, 509 U.S. at ———, 113 S.Ct. at 2823; Voinovich, 507 U.S. at 158–60, 113 S.Ct. at 1158; Davis v. Bandemer, 478 U.S. 109, 127, 106 S.Ct. 2797, 2808, 92 L.Ed.2d 85 (1986); Carrollton Branch of NAACP, 829 F.2d at 1552. A prima facie case of discriminatory intent is established "by showing that racial discrimination was a substantial or motivating factor behind the enactment or maintenance of the electoral system and, second, that the system continues today to have some adverse racial impact." Al–Hakim v. State of Florida, 892 F.Supp. 1464, 1467 (M.D.Fla.1995) (internal quotations and citations omitted); see Shaw, 509 U.S. at ———, 113 S.Ct. at 2823; Davis, 478 U.S. at 127, 106 S.Ct. at 2808; Hunter v. Underwood, 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985); North East Indep. School Dist., 903 F.Supp. at 1093. If these two elements are established, then the burden "shifts to the scheme's defender to demonstrate that the scheme would have been enacted without the purposefully discriminating factor." Al–Hakim, 892 F.Supp. at 1467 (citations omitted); see Hunter, 471 U.S. at 228, 105 S.Ct. at 1920.

In the instant action, plaintiffs have failed to assert any facts whatsoever which would allow the Court to infer discriminatory

intent by the Town for enacting or maintaining the existing electoral system. Accordingly, plaintiffs' Fourteenth and Fifteenth Amendment claims must fail.

■■■■ As to plaintiffs' Thirteenth Amendment claim, the amendment's "independent scope is limited to the eradication of the incidents or badges of slavery and does not reach other acts of discrimination" such as those arising in vote dilution challenges to at-large election systems. *Washington v. Finlay,* 664 F.2d 913, 927 (4th Cir.1981) (involving vote dilution challenge to at-large system for electing city council), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982). Even if the Thirteenth Amendment's scope were so extended, such a claim would require a showing of racial animus. *Memphis v. Greene,* 451 U.S. 100, 126–28, 101 S.Ct. 1584, 1599–1601, 67 L.Ed.2d 769 (1981); *Ashe v. Board of Elections of the City of New York,* No. 88–CV–1566, 1988 WL 95427, at *3 (E.D.N.Y. September 8, 1988). As in the case of their Fourteenth and Fifteenth Amendment claims, plaintiffs have made no such showing.

■■■ Plaintiffs have not identified which rights secured by the First Amendment are infringed by the at-large system for electing the Town Board. The system for electing the Town Board would not, in any event, impinge upon any of the rights secured by this amendment. "The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to" electoral victory. *Finlay,* 664 F.2d at 927–28. "The carefully guarded right to expression does not carry with it any right to be listened to, believed or supported in one's views." *Id.* at 928.

Accordingly, in voting rights cases such as the one at bar, "the protections of the First and Thirteenth Amendments 'do not ... extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.'" *Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352, 1359 (4th Cir.1989) (quoting *Finlay,* 664 F.2d at 927), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990); *accord Repub-lican Party of North Carolina v. Martin,* 980 F.2d 943 n. 28 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993); *Finlay,* 664 F.2d at 927–28; *see also Al–Hakim,* 892 F.Supp. at 1477 (declining to conclude that First Amendment rights violated by at-large system of electing trial judges). Having found no violations of the Fourteenth and Fifteenth Amendments, the Court likewise holds that plaintiffs' First and Thirteenth Amendment claims must fail.

## CONCLUSION

The Court concludes that the plaintiffs have failed to satisfy the *Gingles* preconditions. Even if that conclusion is in error, under the totality of the circumstances, African–Americans have the ability to participate equally in the political process and elect candidates of their choice to the Town Board. This is simply not a case where "a history of persistent discrimination reflected in the larger society and its bloc-voting behavior portend[s] any dilutive effect" from the at-large system for electing the Town Board. *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2658. In other words, the Town of Babylon, New York is not "what the Senate Report termed one of 'those communities in our Nation where racial politics do dominate the electoral process.'" *Niagara Falls,* 65 F.3d at 1023 (quoting S.Rep. at 33, 1982 U.S.C.C.A.N. at 211). Rather, the "failure of [the African–American electorate] to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias against [African–Americans]." *Whitcomb,* 403 U.S. at 153, 91 S.Ct. at 1874. Relief under Section 2 of the Act is therefore denied.

As the Court also finds for defendants on all of the constitutional claims, the Clerk of the Court is directed to enter judgment in favor of defendants dismissing all claims in this action.

SO ORDERED.